705 So.2d 849 (1997)
Timothy Scott COTHREN
v.
STATE.
CR-95-1083.
Court of Criminal Appeals of Alabama.
January 17, 1997.
Opinion Overruling Rehearing April 18, 1997.
*850 William R. Hill, Clanton; and William F. Mathews, Pelham, for appellant.
Bill Pryor, atty. gen., and Andy S. Poole, asst. atty. gen., for appellee.
TAYLOR, Presiding Judge.
The appellant, Timothy Scott Cothren, was convicted of murder made capital because the murder was committed during the course of a robbery, see § 13A-5-40(a)(2), Code of Alabama 1975. The jury, by a vote of 11 to 1, recommended that the appellant be sentenced to death. The trial court accepted the jury's recommendation and sentenced the appellant to death by electrocution.
The state's evidence tended to show that early in the morning of December 16, 1992, the appellant, and two codefendants, Paul Rathe and Tracey West, robbed and killed William Glass, a clerk at the Shop-A-Snak convenience store in Hoover, Alabama. Dr. Perry Argires, of the University of Alabama Medical Center, testified that Glass was comatose when he was admitted to the emergency room and that he never regained consciousness before he was pronounced brain dead. Dr. Joseph Embry, forensic pathologist for the Alabama Department of Forensic Sciences, testified that Glass was shot twice, once in the neck and once in the head, and that he died as a result of the gunshot wound to his head.
The appellant confessed to robbing and murdering Glass and gave a detailed statement about the circumstances surrounding the crime. The appellant confessed in part:
"Tracey [West] went to pump gas while Paul [Rathe] and I went in. We picked up 3 drinks, carried them to the counter and the guy rung them up. When he got the total, I pulled the gun, demanded money and cigs, [sic] and when he turned to get the cartons I aimed at the back of his head but hit his neck. He started screaming, so I shot him again and he fell. Paul grabbed all the Marlboro 200's off the front rack and the money. I grabbed the 3 drinks."
The appellant's codefendant, Paul Rathe, also testified in detail concerning the facts surrounding the murder. Rathe testified about how he met appellant Cothren and West. He stated:
"I had left my house early in the evening and had stopped by a service station to get some gas. And Mr. Cothren and Mr. West, they was walking in the rain and I picked them up and gave them a ride. And we gotwe was riding and they was talking, they just coming to the conversation talking about how they wanted to rob and kill, rob and kill a store to provide a trip across the country. And as the conversation proceeded, we ended up going to my house and picked up a gun, a .25 automatic pistol."
Rathe testified that the three took turns being the triggerman and that when the robbery/murder occurred in Birmingham it was appellant's Cothren's turn to kill the clerk. Rathe further testified to the identical facts surrounding the crime as revealed in the appellant's confession, down to the fact that drinks and cigarettes were taken in the robbery. Rathe also testified that the .25 caliber pistol used in the murder was taken from his father's house. Forty-seven dollars was taken during the robbery/murder.
*851 The appellant was apprehended in Iberia Parish, Louisiana. A .25 caliber pistol was recovered from the residence where the appellant and his codefendants were staying in Louisiana.

I
The appellant initially contends that the trial court erred in allowing statements he made to police to be received into evidence. Specifically, he claims that he had invoked his right to counsel before giving the statements and that, therefore, his confessions were coerced.
The record reflects that on December 19, 1992, the appellant was arrested in Iberia Parish, Louisiana. Sergeant Perry Shaw, of the Iberia Police Department testified that when he arrested the appellant he advised him of his Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), rights. Shaw further testified that Capt. Murphy Meyers of the Iberia Parish Sheriff's Department arrived shortly thereafter, and began questioning the appellant.
Capt. Meyers testified at the suppression hearing that he was present at the scene shortly after the appellant's arrest. Meyers summarized his conversation with the appellant as follows:
"After Sergeant Shaw advised him of his rights and obtained a waiver, I advised Sergeant Shaw to contact the radio room with his vehicle radio and tell them to log down that we had made advised him of the rights at that time.
"I then looked at Cothren who was still bent over the rear of the trunk of the patrol car and asked him if he understood his rights. He turned his head towards me and looked at me and said `Yes,' he did.
"And I asked him, as I normally do which is normally my habit, `Do you understand that you don't have to answer any questions or that you can answer some and not answer others'. And he told me `Yes, I do'. I then asked him `Did you toss a weapon before we caught you'. He said he hadn't had a weapon that day.
"And I asked him then `What weapon'. And still looking at me, Cothren said, `The.25 auto.' I then asked Cothren `When is the last time you possessed that weapon'. At that time, Cothren turned his head straight down to the hood of the car, not looking at me, straight down to the hood of the car and he said in a normal voice, `I think I want to talk to an attorney before I answer that'.

"At that point, I told Cothren, `Well, it shouldn't surprise you then that they have detectives from Mississippi and Alabama en route to speak to you'. He said, `No'."
(Emphasis added.)
Capt. Meyers testified that he instructed Sgt. Shaw to transport the appellant to the sheriff's office. Meyers testified that this was the last time he saw the appellant.
Nathan DeRouen, the chief criminal investigator for the Iberia Parish Sheriff's Office, testified that on the morning of December 19, 1992, he talked with the appellant, but he did not question him. He explained to the appellant that "he was being detained and that he was under arrest for illegal possession of a stolen vehicle from Pulaski, Tennessee, and that he was also going to be questioned in reference to the armed robbery/homicide in Mississippi and an armed robbery/homicide in ... Alabama. He said he understood. And I asked him if he was willing to talk to detectives from these agencies and he said, `Yeah, no problem'." He was not questioned at this time.
Detective Andy Calvanese, of the Harrison County, Mississippi, Sheriff's Department, testified that he and two other investigators arrived at the Iberia Parish Sheriff's Office at approximately 10:30 a.m. on December 19, 1992. Calvanese testified that he and Detective Haden took a video statement from one of the appellant's codefendants before lunch. After lunch, Major Randy Cook, also of the Harrison County Sheriff's Department, told him that "Scott [the appellant] was wanting to talk to us." Calvanese further testified that he and Detective Haden "read [the appellant] the rights on tape and on video, had him acknowledge understanding, which he stated he did understand. He signed the form again on video on both tapes, one on the video and of course the other on the tape."
*852 The statement taken by the investigators from the Harrison County Sheriff's Office was the first statement given by the appellant and concerned the events that occurred after the appellant and his codefendants entered Mississippi. This statement did not involve the Birmingham robbery/murder.
The second statement related to the appellant's involvement in the crimes originating in Tennessee and any subsequent events before he and his codefendants arrived in Mississippi. This statement included the events in Birmingham. The appellant described in detail the events surrounding stealing the Cadillac automobile in Tennessee, stealing gasoline in Huntsville, committing the robbery/murder in Birmingham, and then driving to Mississippi.
The videotaped statement reveals no evidence that the appellant was coerced in any way to talk with police. The appellant was coherent and did not appear to be under the influence of alcohol or drugs during the statement. The appellant also showed no emotion as he confessed to the robbery/murder.
Sgt. Edward Braden testified at the suppression hearing that he and Peyton Zarzaur, both of the Hoover Police Department, took the appellant's statement at approximately 6:30 p.m. on December 19, 1996. Braden, reading from the waiver form the appellant signed, testified that the appellant's constitutional rights were once again read to him before the interview. Braden testified that he instructed the appellant as follows: "If you want a lawyer during questioning but cannot afford one, a lawyer will be approvedexcuse me, be provided for you at no cost to you prior to questioning. If you decide to answer questions now without a lawyer present, you still have the right to stop answering at any time in order to get the advice of a lawyer or for any other reason you might have." The waiver was signed by the appellant and he marked "yes" by the question "Are you willing to answer questions at this time without a lawyer present." The waiver form also indicates that the appellant indicated that no threats or promises had been made to him and that no pressure of any kind had been applied to induce him to answer questions or to give up any of his rights.
Braden and Zarzaur took two statements from the appellant. The first statement was audio taped and related to the crimes beginning in Tennessee and ending in Louisiana. The appellant also gave a written statement to the Hoover Police that described his and his codefendant's involvement in the robbery/murder in Birmingham. The confession stated, in pertinent part:
"Tracey proceeded to pump gas while Paul and I went in. We picked up 3 drinks, carried them to the counter and the guy rung them up. when he got the total, I pulled the gun, demanded money and cigs, [sic] and when he turned to get the cartons I aimed at the back of his head but hit his neck. He started screaming, so I shot him again and he fell. Paul grabbed all the Marlboro 200's off the front rack and the money. I grabbed the 3 drinks."
Following the suppression hearing, the trial court entered a written order that stated, in pertinent part, as follows:
"Based upon the analysis provided in Davis [v. United States, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994)], the Court finds that Defendant's request was not an unequivocal request for an attorney, but was in fact an equivocal request, which request was further clarified by the giving of Miranda rights on at least two (2) occasions between the time of the alleged request for an attorney and the statements made the subject of Defendant's Motion to Suppress.
"The Court also finds quite helpful the analysis provided in the case of State of Arizona v. Eastlack, [ 180 Ariz. 243], 883 P.2d 999 (1994). In Eastlack the Supreme Court of Arizona found that the statement `I think I better talk to a lawyer first' was not an unequivocal request for an attorney and pursuant to Davis no further clarification was necessary. The Supreme Court of Arizona went on further to state that the statement `I think' was ambiguous, using equivocal language `rather than language of a clear request.' Eastlack at 1007."
*853 There are three reasons to uphold the trial court's ruling. First, the statement "I think I want to talk to a lawyer before I answer that" was not an "unequivocal request" for an attorney. Second, the appellant initiated further contact with investigators following his statement "I think I want to talk to an attorney before I answer that." Third, even if the statements were erroneously received into evidence, their admission was harmless beyond a reasonable doubt.
The United States Supreme Court in Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), addressed the basic legal principle that once an accused invokes his right to counsel, the accused is not to be subjected to further questioning. The court stated:
"[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."

451 U.S. at 484-85, 101 S.Ct. at 1885, 68 L.Ed.2d at 386 (1981). (Emphasis added.)
This court in Brown v. State, 668 So.2d 102 (Ala.Cr.App.), cert. denied, 668 So.2d 105 (Ala.1995), quoting Davis v. United States, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), addressed the issue what is an "unequivocal" request for counsel. The court stated:
"`The applicability of the "`rigid' prophylactic rule" of Edwards [v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)] requires courts to "determine whether the accused actually invoked his right to counsel." Smith v. Illinois, 469 U.S. [91], at 95, 105 S.Ct. [490], at 492 [83 L.Ed.2d 488 (1984)], (emphasis added [in Davis]), quoting Fare v. Michael C., 442 U.S. 707, 719, 99 S.Ct. 2560, 2569, 61 L.Ed.2d 197 (1979). To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry. See Connecticut v. Barrett, 479 U.S. [523] at 529, 107 S.Ct. [828] at 832 [93 L.Ed.2d 920 (1987) ]. Invocation of the Miranda right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." McNeil v. Wisconsin, 501 U.S. [171] at 178, 111 S.Ct. [2204], at 2209 [115 L.Ed.2d 158 (1991) ]. But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning. See ibid. (the likelihood that a suspect would wish counsel to be present is not the test for applicability of Edwards;); Edwards v. Arizona, supra, 451 U.S. [477], at 485, 101 S.Ct. [1880], at 1885 [68 L.Ed.2d 378 (1981) ] (impermissible for authorities "to reinterrogate an accused in custody if he has clearly asserted his right to counsel") (emphasis added in Davis).

"`Rather, the suspect must unambiguously request counsel. As we have observed, "a statement either is such an assertion of the right to counsel or it is not." Smith v. Illinois, 469 U.S., at 97-98, 105 S.Ct., at 494 (brackets and internal quotation marks omitted). Although a suspect need not "speak with the discrimination of an Oxford don",: post, [512 U.S. at 476, 114 S.Ct.], at 2364 (SOUTER, J., concurring in judgment), he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, Edwards does not require that the officers stop questioning the suspect. See Moran v. Burbine, 475 U.S. 412, 433, n. 4, 106 S.Ct. 1135, 1147, n. 4, 89 L.Ed.2d 410 (1986), ("the interrogation must cease until an attorney is present only [i]f the individual states that he wants *854 an attorney") (citations and internal quotation marks omitted).'"
Brown, 668 So.2d at 103.
In the present case, the appellant said to Capt. Meyers "I think I want to talk to an attorney before I answer that." In Brown, the defendant asked the officer "Is it going to piss y'all off if I ask for my to talk to a friend that is an attorney? I mean, I'm going to do whatever I have got to do. Don't get me wrong." The Brown court held that this was not an unambiguous request for counsel. Brown, 668 So.2d at 103.
In Davis, the accused made a statement similar to the one at issue in the present case.
"Petitioner waived his rights to remain silent and to counsel, both orally and in writing.
"About an hour and a half into the interview, the petitioner said, `Maybe I should talk to a lawyer.' App. 135. According to the uncontradicted testimony of one of the interviewing agents the interview then proceeded as follows:
"`[We m]ade it very clear that we're not here to violate his rights, that if he wants a lawyer, then we will stop any kind of questioning with him, that we weren't going to pursue the matter unless we have it clarified is he asking for a lawyer or is he just making a comment about a lawyer, and he said, ["]No, I'm not asking for a lawyer," and then he continued on, and said, "No, I don't want a lawyer." Id., at 136.'
"After a short break, the agents reminded petitioner of his rights to remain silent and to counsel. The interview then continued for another hour, until petitioner said, `I think I want a lawyer before I say anything else.' Id., at 137. At that point, questioning ceased.
"At his general court-martial, petitioner moved to suppress statements made during the November 4 interview. The military judge denied the motion, holding that `the mention of a lawyer by [petitioner] during the course of the interrogation [was] not in the form of a request for counsel and ... the agents properly determined that [petitioner] was not indicating a desire for or invoking his right to counsel.' Id., at 164."
Davis, 512 U.S. at 455, 114 S.Ct. at 2353, 129 L.Ed.2d 362 (1994), (Emphasis added.)
The Davis Court, finding that there was no reason to suppress the statement because there was not an unequivocal request for counsel, stated:
"But we decline to adopt a rule requiring officers to ask clarifying questions. If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him.
"To recapitulate: We held in Miranda that a suspect is entitled to the assistance of counsel during custodial interrogation even though the Constitution does not provide for such assistance. We held in Edwards that if the suspect invokes the right to counsel at any time, the police must immediately cease questioning him until an attorney is present. But we are unwilling to create a third layer of prophylaxis to prevent police questioning when the suspect might want a lawyer. Unless the suspect actually requests an attorney, questioning may continue.
"The courts below found that petitioner's remark to the NIS agents'Maybe I should talk to a lawyer'was not a request for counsel, and we see no reason to disturb that conclusion. The NIS agents therefore were not required to stop questioning petitioner, though it was entirely proper for them to clarify whether petitioner in fact wanted a lawyer."
Davis, 512 U.S. at 461-62, 114 S.Ct. at 2356-57, 129 L.Ed.2d 362. (Emphasis in original.)
Relying on Davis, we hold that the statement made by the appellant was not an unequivocal request for counsel. Furthermore, police clarified the situation by asking the appellant two different times after he made this statement if he wanted to waive counsel. The appellant waived his right to counsel each time.
Secondly, even if we were to hold that the appellant's statement was an unequivocal request for counsel, there is evidence that *855 the appellant initiated further contact with police after he made the request. The record indicates that several hours after his arrest, he initiated contact with Harrison County Sheriff's investigator Randy Cook and informed him that he wanted to talk to police.
Thirdly, even if we hold that the admission of the statements was error, we would find that the admission of the statements was harmless beyond a reasonable doubt.
"The question becomes: Was the receipt of the statement into evidence harmless error? In Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), the United States Supreme Court held that the harmless error doctrine could be applied to coerced confessions received into evidence at trial. That Court stated:
"`When reviewing the erroneous admission of an involuntary confession, the appellate court, as it does with the admission of other forms of improperly admitted evidence, simply reviews the remainder of the evidence against the defendant to determine whether the admission of the confession was harmless beyond a reasonable doubt.'
"499 U.S. at 310, 111 S.Ct. at 1265, 113 L.Ed.2d at 332. (Emphasis added.) `In order for the harmless error doctrine to be applied in this situation, the evidence against the accused must be overwhelming.' McCray [v. State], 629 So.2d [729] at 732; Smith v. State, 623 So.2d 369, 372 (Ala.Cr.App.1992), cert. denied, 510 U.S. 1030, 114 S.Ct. 650, 126 L.Ed.2d 607 (1993)."
Fisher v. State, 665 So.2d 1014, 1017 (Ala.Cr. App.1995).
Here, one of the appellant's codefendant, Paul Rathe, testified that the appellant shot William Glass in the neck when he turned around to get cigarettes and that when he started screaming the appellant shot him again. His testimony was corroborated by evidence from the crime scene, which included a cash register receipt tape listing the same items that the codefendant had testified were taken, the two bullets that were found to have been shot from the seized gun, and also the location of the victim when officers arrived on the scene.
The accomplice's testimony and the evidence in support of the state's case was sufficient to prove beyond a reasonable doubt that the appellant committed the robbery/murder.
Under the standards articulated in Davis and Brown, the appellant's confessions were correctly received into evidence. Furthermore, the record reflects that the appellant initiated further contact with police. Moreover, if any error did occur in the admission of the confession, the error was harmless beyond a reasonable doubt.

II
The appellant next contends that the trial court erred in denying his motion to dismiss the indictment against him because, he argues, the death penalty is cruel and unusual punishment and is therefore unconstitutional.
Capital punishment has repeatedly been upheld against such constitutional attacks. As we stated in Tarver v. State, 553 So.2d 631, 632 (Ala.Cr.App.), aff'd, 553 So.2d 633 (Ala.1989), cert. denied, 494 U.S. 1090, 110 S.Ct. 1837, 108 L.Ed.2d 966 (1990):
"The appellant argues that Alabama's capital punishment statute violates the fifth and fourteenth amendments to the United States Constitution. Specifically, he argues that this capital punishment statute constitutes cruel and unusual punishment because he says, it does not provide proper standards and safeguards to insure that the death penalty is not inflicted arbitrarily. However, this argument has also been previously addressed and rejected. Thompson v. State, 542 So.2d 1286 (Ala.Cr.App.1988). See also Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976)."
In Carden v. State, 612 So.2d 509 (Ala.Cr. App.1992), we stated:
"[T]he [death penalty] statute has been upheld against constitutional challenges that it constitutes cruel and unusual punishment. See Tarver v. State, 553 So.2d *856 631 (Ala.Cr.App.), aff'd, 553 So.2d 633 (Ala. 1989), cert. denied, 494 U.S. 1090, 110 S.Ct. 1837, 108 L.Ed.2d 966 (1990), and cases cited therein; Thompson v. State, 542 So.2d 1286 (Ala.Cr.App.1988), aff'd, 542 So.2d 1300 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989). See also Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976)."
612 So.2d at 513.
In State v. Tarver, 629 So.2d 14 (Ala.Cr. App.1993), we reiterated: "The death penalty has on many occasions withstood constitutional attacks on this ground." See also Harrell v. State, 470 So.2d 1303 (Ala.Cr.App. 1984), aff'd, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).

III
The appellant further contends that the trial court erred by denying his oral motion to quash the jury venire because, he alleges, the venire selection process was unconstitutional. He specifically argues that the method of selection must include all qualified citizens, not a "fair cross-section" of the community.
"The Sixth Amendment requires that juries `be drawn from a source fairly representative of the community.' Taylor v. Louisiana, 419 U.S. 522, 538, 95 S.Ct. 692, 702, 42 L.Ed.2d 690 (1975). However, `[i]n order to establish a Sixth Amendment fair cross-section requirement violation, the accused has the burden of proving a systematic exclusion of blacks resulting in their underrepresentation on the jury rolls.' Stewart v. State, 623 So.2d 413, 415 (Ala. Cr.App.1993).
"`In Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the United States Supreme Court held that a defendant seeking to establish a prima facie case of a violation of the fair cross-section requirement must demonstrate the following three elements:
"`"(1) that the group alleged to be excluded is a `distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process."'
"Sistrunk v. State, 630 So.2d 147, 149 (Ala. Cr.App.1993)."
Inabinett v. State, 668 So.2d 170, 173 (Ala.Cr. App.1995).
The appellant contends that "the present state-wide system adopted by the Administrative Office of Courts is governmental expediency at the cost of individual constitutional rights." The appellant further argues that a fair cross-section of all qualified citizens would demand the inclusion of persons on voter registration lists, persons on social security rolls, property landowners, and persons on other census polls. The appellant "is not entitled to a venire representing an exact cross-section of the community. He is, however, entitled to a jury venire that was drawn free from the systematic exclusion of any one group." Guthrie v. State, 689 So.2d 935, 939 (Ala.Cr.App.1996).
This court in Dobyne v. State, 672 So.2d 1319 (Ala.Cr.App.), on remand, 672 So.2d 1353 (Ala.Cr.App.1994), aff'd, 672 So.2d 1354 (Ala.1995), cert. denied, ___ U.S. ___, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996), addressed this issue, and stated:
"`It is true that the particular panel from which the appellant's jury was struck contained a substantially smaller percentage of blacks than does the population of Dale County. However, the fair cross-section requirement ensures only a venire of randomness, one free of systematic exclusion. It does not ensure any particular venire. Rather than being entitled to a cross-sectional venire, a defendant has a right only to a fair chance, based on a random draw of having a jury drawn from a representative panel.'"
672 So.2d at 1329, quoting Sistrunk v. State, 630 So.2d 147, 150 (Ala.Cr.App.1993).
The record clearly indicates that the jury venire was randomly selected from a list of licensed drivers in Shelby County. This court has repeatedly upheld this method of random selection against constitutional challenges. *857 See Inabinett, supra; Dobyne, supra; Sistrunk, supra; Guthrie, supra.

IV
The appellant contends that the trial court erred in denying his motion for a change of venue because, he says, extensive pretrial publicity made it impossible for him to receive a fair trial. Specifically, the appellant contends that a Birmingham News article concerning the facts surrounding the case was published the day before the commencement of trial. The appellant argues that a fair and impartial trial and an unbiased verdict could not reasonably be expected in Shelby County because of the vast number of households that subscribe to Birmingham News and who were likely to have read the abovementioned article.
"A trial court is in a better position than an appellate court to determine what effect, if any, pretrial publicity might have in a particular case. The trial court has the best opportunity to evaluate the effects of any pretrial publicity on the community as a whole and on the individual members of the jury venire. The trial court's ruling on a motion for a change of venue will be reversed only when there is a showing that the trial court has abused its discretion. Nelson v. State, 440 So.2d 1130 (Ala.Cr. App.1983)."
Joiner v. State, 651 So.2d 1155, 1156 (Ala.Cr. App.1994).
The Alabama Supreme Court in Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985), set forth the standard the trial court should use in deciding whether to grant a motion for a change of venue, based upon pretrial publicity.
"In order to grant a motion for change of venue, the defendant must prove that there existed actual prejudice against the defendant or that the community was saturated with prejudicial publicity. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Franklin v. State, 424 So.2d 1353 (Ala.Cr.App.1982). Newspaper articles or widespread publicity, without more, are insufficient to grant a motion for change of venue. Anderson v. State, 362 So.2d 1296, 1298 (Ala.Cr.App.1978). As the Supreme Court explained in Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642-43, 6 L.Ed.2d 751 (1961):
"`To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court....'
"The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved. Murphy v. Florida, 421 U.S. 794, 799-800, 95 S.Ct. 2031, 2035-2036, 44 L.Ed.2d 589 (1975). Thus, `the proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.' Anderson v. State, 362 So.2d 1296, 1299 (Ala.Cr.App.1978)."
Grayson, 479 So.2d at 80.
Here, the trial court conducted an extensive voir dire examination of the entire jury venireboth individually and as a group. The jurors who were not struck for cause stated that they could disregard what they had previously seen or heard and base their verdict strictly on the facts as presented and the law as instructed by the court.
"[A] change of venue must be granted only when it can be shown that the pretrial publicity has so `pervasively saturated' the community as to make the `court proceedings nothing more than a "hollow formality" `... or when actual prejudice can be demonstrated. The burden of showing this saturation of the community or actual prejudice lies with the appellant."
Oryang v. State, 642 So.2d 979, 983 (Ala.Cr. App.1993), aff'd 642 So.2d 989 (Ala.Cr.App. 1994).
The only evidence the appellant presented that pretrial publicity had saturated the community or that the pretrial publicity biased the members of the venire against him was the fact that the day before trial the Birmingham News had printed an article that *858 the appellant argues was "extremely inflammatory and designed to show aggravating circumstances." The article stated that 12 hours after the killing in Hoover a convenience store clerk was killed in Kiln, Mississippi. The article also contained a quote from the Hoover Chief of Police, which said "The clerks were no threat to them and there was no shoot outjust a total disregard for human life."
As this court stated in Grayson, 479 So.2d at 80: "The defendant is not entitled to jurors who are totally ignorant of the facts and issues involved in the case or to jurors who never entertained a preconceived notion as to the defendant's guilt or innocence." Furthermore, "A defendant is entitled to a trial by jurors who can lay aside any preconceived impressions or opinions and render a verdict based on the evidence which is presented at trial, id." Oryang, 642 So.2d at 993.
The prospective jurors in this case were questioned extensively regarding their knowledge of the case and any effect that pretrial publicity may have had on their ability to be fair and impartial. The trial court did not err in denying the appellant's motion for a change of venue.

V
The appellant next contends that the trial court erred by allowing the state to introduce evidence of collateral crimes. He filed a motion in limine requesting that the state be prohibited from using evidence of his involvement in a robbery/murder in Biloxi, Mississippi, which occurred some 12 hours after the crime in Birmingham.
As a general rule, evidence of an unrelated collateral offense should not be received into evidence. However, there are certain exceptions to this general exclusionary rule that have long been recognized. These exceptions and the standard used to determine whether such evidence should be received at trial were discussed by this court in Bush v. State, 695 So.2d 70 (Ala.Cr.App. 1995). In Bush, this court stated:
"Evidence of any offense other than that specifically charged is prima facie inadmissible. Nicks v. State, 521 So.2d 1018 (Ala. Cr.App.1987), aff'd, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988). However, evidence of collateral crimes or bad acts is admissible as part of the prosecutor's case if the defendant's collateral misconduct is relevant to show his guilt other than by suggesting that he is more likely to be guilty of the charged offense because of his past misdeeds. Nicks v. State; Brewer v. State, 440 So.2d 1155 (Ala.Cr.App.1983); C. Gamble, McElroy's Alabama Evidence, § 69.01(1) (4th ed. 1991). Before its probative value will be held to outweigh its potential prejudicial effect, the evidence of a collateral crime must not only be relevant, it must also be reasonably necessary to the state's case, and it must be plain and conclusive. Averette v. State, 469 So.2d 1371 (Ala.Cr.App.1985). If evidence of the accused's commission of another crime is admissible, the state may prove in meticulous detail the manner in which the accused committed such other crime. Nelson v. State, 511 So.2d 225, 234 (Ala.Cr. App.1986), aff'd, 511 So.2d 248 (Ala.1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988); Weatherford v. State, 369 So.2d 863 (Ala.Cr.App.), cert. denied, 369 So.2d 873 (Ala.), cert. denied, 444 U.S. 867, 100 S.Ct. 141, 62 L.Ed.2d 91 (1979); McElroy's, § 69.02(8). The generally recognized exceptions to the general exclusionary rule, or tests for relevancy, whereby evidence of collateral crimes or acts may be admitted are as follows:
"`(1) Relevancy to prove physical capacity, skill, or means to commit the now-charged crime; (2) part of the res gestae or part of a continuous transaction; (3) relevancy to prove scienter or guilty knowledge; (4) relevancy to prove criminal intent; (5) relevancy to prove plan, design, scheme, or system; (6) relevancy to prove motive; (7) relevancy to prove identity; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes.'
"Nelson v. State, 511 So.2d 225, 233 (Ala. Cr.App.1986); Twilley v. State, 472 So.2d 1130 (Ala.Cr.App.1985). All of the exceptions relate to the relevancy of the evidence, *859 which means that evidence of separate and distinct crimes is admissible only when the evidence is relevant to the crime charged. Mason v. State, 259 Ala. 438, 66 So.2d 557 (1953); Nicks v. State. If the evidence is not so remote as to lose its relevancy, the decision to allow or to not allow evidence of collateral crimes or acts as part of the state's case rests in the sound discretion of the trial court. McGhee v. State, 333 So.2d 865 (Ala.Cr. App.1976)."
695 So.2d at 85. See also Finley v. State, 661 So.2d 762 (Ala.Cr.App.1995); Malone v. State, 659 So.2d 1006 (Ala.Cr.App.1995); Miles v. State, 650 So.2d 583 (Ala.Cr.App. 1994).
In receiving evidence of the collateral offenses into evidence, the trial court stated that this evidence met an exception to the general exclusionary rule because it was relevant to show a common plan or scheme and the collateral offenses were thus part of the res gestae.
The trial court's order stated, in pertinent part, as follows:
"While the Court finds that these other acts are admissible, the Court finds that many of the details of these acts would be so prejudicial as to outweigh their probative value and specifically limit the details that the State may be allowed to go into. Specifically, the Court will limit the State from going into any details of the shooting in the Biloxi, Mississippi area. Only the particular details of the incident which are supported by Defendant's statement will be admitted. The Court reserves the right to further restrict the State's inquiry into any of the details of the alleged incident and will hear defense counsel with regard to any particular details that counsel feels are so prejudicial as to substantially outweigh their probative value."
To eliminate further confusion, the trial judge gave a limiting instruction as follows:
"That evidence [collateral acts in Mississippi] is not admissible generally in this case for the purpose of showing the bad acts of the defendant on another occasion that he acted and, therefore, the bad character or nature of the defendant and that he acted in conformity therewith on this occasion. It is not admissible for that purpose and you may not consider it for that purpose.
"You may only consider it for the purpose of showing a common plan or scheme type situation and/or for the purpose that it is all really involved in one single transaction. But do understand, even if you consider it for purposes [that] it's involved in one single transaction or one continuing crime spree is some of the language used by one or both of the attorneys, even assuming that, this defendant is not on trial here at this time for anything other than the occasion or the incident occurring within this jurisdiction."
We agree with the trial court's ruling in receiving evidence of collateral offenses under the above exceptions. "The two crimes are intertwined and connected to such an extent that they form one continuous transaction." Bush, 695 So.2d at 86. C. Gamble, McElroy's Alabama Evidence, § 70.01(12)(b) (5th ed. 1996), in regard to the res gestae exception, states, "The prosecution may prove the accused's commission of collateral crimes, wrongs or acts if the evidence warrants a reasonable inference that such other crime was a part of the same transaction as the now-charged homicide."
The appellant's foremost argument regarding this issue does not dispute the exceptions to the general exclusionary rule, but rather, argues that the "common plan or scheme" exception does not apply to this particular capital offense. Specifically, he argues that because 12 hours had elapsed between the two murders, the act could not be part of one "common plan or scheme." We disagree.
In Ex parte Windsor, 683 So.2d 1042, 1053 (Ala.1996), the Alabama Supreme Court stated:
"The robbery and murder of Rayford Howard and the robbery and murder of Randall Earl Pepper occurred only hours apart, on the same day. Both victims were convenience store owners, and the crimes were factually similar. Therefore, the trial court did not err in admitting evidence regarding Windsor's participation in the *860 robbery and murder of Randall Earl Pepper."
See also Guthrie v. State, 616 So.2d 914 (Ala.Cr.App.1993).
The Alabama Supreme Court in Windsor created no time limitation. The facts of this case clearly establish that the collateral capital offenses were part of a continuous crime spree. There were overwhelming similarities in the charged crime and the collateral offense. The record clearly indicates that in each of the murders, the appellant and his codefendants drove around, scouting out convenience stores whose the clerks appeared to be vulnerable and defenseless. In both murders, the same gun was used, the same defendants were involved, a similar method was used in selecting the stores and in carrying out the murder, and the same stolen vehicle was driven in the escape. The appellant and his codefendants exhibited a distinctive method of criminal activity in each murder. The Biloxi murder was distinguished from the Hoover murder solely because the appellant did not pull the trigger.
For the foregoing reasons, the trial court did not err in receiving evidence of the collateral offenses into evidence during trial.

VI
Last, as required by § 13A-5-53, Code of Alabama 1975, we will address the propriety of the appellant's conviction and sentence to death. The appellant was indicted and convicted of murder during the course of a robbery, a capital offense as defined in § 13A-5-40(a)(2), Code of Alabama 1975.
The record reflects that the appellant's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. § 13A-5-53(b)(1), Code of Alabama 1975.
The trial court found that the aggravating circumstances outweighed the mitigating circumstances. The trial court found as the only aggravating circumstance the fact that the murder occurred during the course of a robbery, an aggravating circumstance defined in § 13A-5-49(4). The trial court reviewed all the evidence offered in mitigation and found as statutory mitigation the fact that the appellant was 19 years of age when he committed the robbery/murder. § 13A-5-51(7). The trial court found as follows with regard to nonstatutory mitigating circumstances:
"[The] Defendant, offered evidence with regard to many nonstatutory mitigating circumstances, including but not limited to the age and maturity of Defendant, the involvement of alcohol and/or drugs in Defendant's life and the effect that alcohol and drugs may have had in creating a diminished capacity in Defendant to understand and appreciate his actions, the Defendant's family history and the lack of stable family life, the immediate and continuing remorse of Defendant, the fact that there are no other aggravating circumstances other than the one listed above, and co-Defendant Rathe's plea agreement to serve concurrent life sentences (one in Mississippi and one in Alabama)."
The court weighed the aggravating circumstances and the mitigating circumstances and sentenced the appellant to death. We agree with the court's findings.
However, pursuant to § 13A-5-53(b)(2), this Court must independently weigh the aggravating and the mitigating circumstances to determine the propriety of the appellant's sentence to death. After an independent weighing, this Court is convinced that the appellant's sentence to death by electrocution is appropriate.
We must also address whether the appellant's sentence was disproportionate or excessive to the penalties imposed in similar cases. The appellant's sentence was neither. Dobyne v. State, 672 So.2d 1319 (Ala.Cr. App.), on remand, 672 So.2d 1353 (Ala.Cr. App.1994), aff'd, 672 So.2d 1354 (Ala.1995), cert. denied, ___ U.S. ___, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996); Brownlee v. State, 545 So.2d 151 (Ala.Cr.App.1988), aff'd, 545 So.2d 166 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989); Baldwin v. State, 456 So.2d 117 (Ala.Cr.App. 1983); aff'd, 456 So.2d 129 (Ala.), cert. granted, 469 U.S. 1085, 105 S.Ct. 589, 83 L.Ed.2d 699 (1984), aff'd, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985); Bell v. State, 475 So.2d 601 (Ala.Cr.App.1984), aff'd, 475 So.2d *861 609 (Ala.), cert. denied, 474 U.S. 1038, 106 S.Ct. 607, 88 L.Ed.2d 585 (1985);
Last, we have searched the record for any error that may have adversely affected the appellant's substantial rights and have found none. Rule 45A, Ala.R.App.P.
The appellant's conviction and sentence to death by electrocution are due to be, and are hereby, affirmed.
AFFIRMED.
All the Judges concur.

ON APPLICATION FOR REHEARING
BASCHAB, Judge.
The original opinion in this case was authored by Judge Taylor. This case was reassigned to me on January 31, 1997, when the appellant, Timothy Scott Cothren, filed his application for rehearing. This court's opinion of January 17, 1997, is hereby extended.
The appellant argues that this court's ruling in its original opinion in this case contradicts its holding in O'Shields v. State, 689 So.2d 227 (Ala.Cr.App.1996). In O'Shields, we held that the phrase "I think I may need a lawyer" was an unequivocal request for a lawyer and that the defendant's subsequent confession should have been suppressed.[1] We also held in O'Shields that the failure of the trial court to suppress the defendant's confession was harmless error, because the remaining evidence against the defendant was overwhelming.
It should be noted that then Presiding Judge Taylor wrote both the O'Shields opinion and the original opinion in this case. It is clear that in this opinion, Judge Taylor engaged in further analysis of the relevant caselaw. He specifically considered Davis v. United States, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), Brown v. State, 668 So.2d 102 (Ala.Cr. App.), cert. denied, 668 So.2d 105 (Ala.1995),[2] and concluded that the appellant's statement was not an unequivocal request for legal counsel.
Insofar as O'Shields conflicts with this opinion and with the original opinion written by Judge Taylor, O'Shields is overruled.
APPLICATION OVERRULED; OPINION EXTENDED.
All Judges concur.
NOTES
[1] Judge Cobb concurred specially, stating that the defendant's confession was voluntary and that the trial court did not err in allowing the confession into evidence.
[2] See the original opinion for a detailed analysis of these cases.