STUART, Justice.[1]
James Ben Brownfield, Jr., was convicted of three counts of capital murder, see *45 § 13A-5-40(a)(4) (murder committed during a burglary), § 13A-5-40(a)(10) (murder of two or more persons by one act or pursuant to one scheme or course of conduct), and § 13A-5-40(a)(15) (murder when the victim is less than 14 years of age), Ala.Code 1975. The jury, by a vote of 11-1, recommended that Brownfield be sentenced to death. After conducting a sentencing hearing, the trial court sentenced Brownfield to death. The Court of Criminal Appeals affirmed Brownfield’s convictions and sentence. Brownfield v. State, 44 So.3d 1 (Ala.Crim.App.2007). We granted certiorari review to determine a material question of first impression, concerning Rule 11.2(b), Ala. R.Crim. P.
Brownfield was arrested for and confessed to murdering Brenda Whitehead McCutchin, Joshua Dewayne Hodges, and Latham Durwood McCutchin. Brownfield pleaded not guilty and not guilty by reason of mental disease or defect. To determine whether Brownfield was competent to stand trial and to determine his mental condition at the time he committed the offenses, the trial court ordered pretrial mental examinations pursuant to Rule 11.2(a)(1) and (2), Ala. R.Crim. P.[2] Dr. Melissa Clinger, a psychologist, conducted the examinations.
During the guilt phase of Brownfield’s trial, the State called Dr. Clinger as a rebuttal witness to address evidence offered by Brownfield through his expert witnesses about his mental condition at the time of the offenses. Dr. Clinger testified that during the pretrial mental examinations Brownfield informed her that he had a high-school diploma, that he had completed three years of technical school, that he “was doing three different things for one year,” that he had worked at a variety of fast-food establishments, that he had held the position of assistant manager once, and that he was a cook at another restaurant and was looking to be promoted to a crew or shift chief. The State then questioned Dr. Clinger as to whether Brownfield had informed her about his activities on December 23, 24, and 25, 2001.[3] The following occurred:
“[Prosecutor]: All right; did he have any memory at all as to his activities on December 23rd, 24th, and 25th?
“[Dr. Clinger]: He was able to provide me with an account of what he was doing during most of that time.
“[Prosecutor]: All right; was he able to recall getting into a verbal dispute with his sister [Brenda McCutchin] on the 23rd?
“[Dr. Clinger]: Yes.
“[Prosecutor]: And what details was he able to provide regarding that?
“[Dr. Clinger]: Well, it was something about—
[[Image here]]
*46 “[Prosecutor]: Dr. Clinger, I believe before lunch, I had asked whether Mr. Brownfield was able to provide you with specific details about the conflict that he had with his sister on December 23rd, 2001; is that correct?
“[Dr. Clinger]: Yes.
“[Prosecutor]: And was he able to provide you with specific details regarding that conflict?
“[Dr. Clinger]: Yes.
“[Prosecutor]: And what sort of details was he able to provide to you?
“[Dr. Clinger]: He was unhappy with his sister and something about that he had given her money and she was supposed to have gone and procured drugs. And then she had taken some or there was something about some problems with arranging with the dealer.
“[Prosecutor]: Okay, and that’s what he described occurring on December 23, 2001; is that correct?
“[Dr. Clinger]: Yes.
“[Prosecutor]: Now, with regard to December 24th 2001, could he recall taking a shower at Tammy Farmer’s[4] house?
“[Dr. Clinger]: Yes.
“[Prosecutor]: And what about riding around with Nick Logan?
“[Dr. Clinger]: Yes.
“[Prosecutor]: Now, did he ever recall telling Tammy what had happened?
“[Dr. Clinger]: Well, he told me that he did, yes.
“[Prosecutor]: Now what about on the 25th? Was he able to recall whether or not the Scottsboro Police officers gave him his Miranda[5] rights?
“[Dr. Clinger]: Yes.
“[Prosecutor]: And what did he say to that?
“[Dr. Clinger]: He said that he recalled it.
“[Prosecutor]: And did he ever describe to you experiencing rage?
“[Dr. Clinger]: Yes.
“[Prosecutor]: Now, what was the significance to you for the purposes that you’ve been assigned to this case of the details and the specifics that he was able to provide regarding the 23rd, the 24th, and the 25th?
“[Dr. Clinger]: Well, I was looking for a couple of different reasons. One reason was to see did he have enough information to work with his attorney and another reason is to sort of see was he able to give me a sequential and logical account of what was going on to assess memory.
“[Prosecutor]: Now, the fact that he couldn’t remember everything perfectly, did you find that to be unusual?
“[Dr. Clinger]: No.
“[Prosecutor]: Now, based on your inspection and examination of [Brownfield] and pursuant to the orders of this court, have you reached an opinion as to whether the defendant, Ben Brownfield, suffered at the time of the offense from a severe mental disease or defect?
“[Dr. Clinger]: I saw no indication to the point that he ever suffered from a severe mental disease or defect, you know, ever or during the time of the alleged offense.
“[Prosecutor]: Now, based on your examination and inspection of him, were you able to develop an opinion as to whether he was able to appreciate the nature and quality or the wrongfulness of his acts regarding the time period in *47 question, December 23rd, 24th, and 25th?
“[Dr. Clinger]: I thought that he had no significant impairment as far as mental illness or cognitive deficits or problems in thinking that would have interfered with his ability to appreciate the wrongfulness of his acts and the consequences.”
On cross-examination, Brownfield’s counsel elicited testimony from Dr. Clinger that Brownfield had informed her that on December 23, 2001, he had ingested several Xanax tablets and had snorted crystal methamphetamine. She testified that he also told her that in the past he had had difficulty recalling events that had happened while he was under the influence of Xanax.
Before the Court of Criminal Appeals, Brownfield argued that the trial court erred in admitting Dr. Clinger’s testimony because, he says, the testimony was prohibited by Rule 11.2(b). Specifically, he objected to the admission of Dr. Clinger’s testimony regarding statements he had made during the mental examinations. The Court of Criminal Appeals upheld the trial court’s evidentiary ruling, holding that Brownfield had opened the door to the issue of his mental state at the time of the offenses by pleading “not guilty by reason of mental disease or defect,” by putting on evidence of his mental state at the time of the offenses through the testimony of Dr. Roger Lacy, and by Brownfield’s counsel’s questioning of other witnesses, attempting to portray Brownfield as unable to recall the events or to speak voluntarily with authorities. However, the fact that Brownfield “opened the door” for the State to present testimony with regard to his mental condition is not determinative of whether the admission of the testimony regarding statements Brownfield made during the pretrial mental examinations was proper.
Rule 11.2(b), Ala. R.Crim. P., governs the admissibility of testimony about statements made by a defendant during a mental examination. Rule 11.2(b)(2), provides:
“(2) The results of mental examinations made pursuant to subsection (a)(2) of this rule [providing for examination into the defendant’s mental condition at the time of the offense] and the results of similar examinations regarding the defendant’s mental condition at the time of the offense conducted pursuant to Rule 11.4 shall be admissible in evidence on the issue of the defendant’s mental condition at the time of the offense only if the defendant has not subsequently withdrawn his or her plea of not guilty by reason of mental disease or defect. Whether the examination is conducted with or without the defendant’s consent, no statement made by the defendant during the course of any examination, no testimony by an examining psychiatrist or psychologist based upon such a statement, and no other evidence directly derived from the defendant’s statement shall be admitted against the defendant in any criminal proceeding, except on an issue respecting mental condition on which the defendant has testified.”
(Emphasis added.)
The plain language of Rule 11.2(b)(2) unequivocally forbids the admission of statements made by a defendant or evidence derived from the defendant’s statements during a pretrial mental examination unless the defendant testifies about his or her mental condition. Consequently, because Brownfield did not testify at his trial, applying the plain language of Rule 11.2(b)(2), we must conclude that error occurred in the admission of Dr. Cling *48 er’s testimony concerning statements Brownfield made during the mental examinations. Although it was proper to admit into evidence Dr. Clinger’s testimony regarding her opinion about Brownfield’s mental condition at the time of the offenses, the admission of her testimony regarding statements made by Brownfield during the mental examinations was error.
The inquiry, however, does not end here. This Court must determine whether it “appear[s] that the error complained of has probably injuriously affected [Brownfield’s] substantial rights.” Rule 45, Ala. R.App. P., provides:
“No judgment may be reversed or set aside, nor new trial granted in any civil or criminal case on the ground of misdirection of the jury, the giving or refusal of special charges or the improper admission or rejection of evidence, nor for error as to any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties.”
The Court of Criminal Appeals has further stated with regard to the application of the harmless-error rule:
“ ‘ “After finding error, an appellate court may still affirm a conviction on the ground that the error was harmless, if indeed it was.” Guthrie v. State, 616 So.2d 914, 931 (Ala.Crim.App.1993), citing Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). “The harmless error rule applies in capital cases.” Knotts v. State, 686 So.2d 431, 469 (Ala.Crim.App.1995), opinion after remand, 686 So.2d 484 (Ala.Crim.App.1995), aff'd, 686 So.2d 486 (Ala.1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1559, 137 L.Ed.2d 706 (1997), citing Ex parte Whisenhant, 482 So.2d 1241 (Ala.1983). “In order for a constitutional error to be deemed harmless under Chapman, the state must prove beyond a reasonable doubt that the error did not contribute to the verdict. In order for the error to be deemed harmless under Rule 45, the state must establish that the error did not injuriously affect the appellant’s substantial rights.” Coral v. State, 628 So.2d 954, 973 (Ala.Crim.App.1992), opinion after remand, 628 So.2d 988 (Ala.Crim.App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994). “The purpose of the harmless error rule is to avoid setting aside a conviction or sentence for small errors or defects that have little, if any, likelihood of changing the result of the trial or sentencing.” Davis v. State, 718 So.2d 1148, 1164 (Ala.Crim.App.1997), aff'd, 718 So.2d 1166 (Ala.1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999).’
“McNabb v. State, 887 So.2d 929, 976-77 (Ala.Crim.App.2001).”
Sale v. State, 8 So.3d 330, 347 (Ala.Crim.App.2008). See also Ex parte Brown, 11 So.3d 933 (Ala.2008) (holding that the alleged improper admission of evidence in a capital trial was harmless); Cothren v. State, 705 So.2d 849 (Ala.Crim.App.1997) (holding that the improper admission of the defendant’s coerced confession was harmless in light of the overwhelming evidence establishing that the defendant committed the capital offense).
In this case, a review of the record establishes that the admission of Dr. Clinger’s testimony was harmless; the improperly admitted evidence could not have probably injuriously affected Brownfield’s substantial rights. The admission of testi *49 mony regarding Brownfield’s statements concerning his education and work experience is harmless because those statements are not relevant to whether Brownfield committed the offense or to his mental condition at the time of the offense. Consequently, testimony concerning those statements could not have probably injuriously affected Brownfield’s substantial rights. Likewise, Dr. Clinger’s testimony regarding Brownfield’s recollection of the events on December 23, 24, and 25, 2001, could not have probably injuriously affected Brownfield’s substantial rights because statements Brownfield made to law-enforcement officers on December 25 and 26, 2001, had been previously admitted into evidence and established with greater detail what Brownfield recalled regarding the events leading up to and following the murders. Brownfield’s statement on December 25 provides:
“This statement is written by Investigator Petty for Mr. Brownfield as told by him. My sister, [Brenda McCutch-in], brother-in-law [Latham McCutchin] and myself had been arguing off and on for a while. Brenda was accusing me of taking her money, and she was ripping me off, too. Sunday night, 12/23/01, she, Brenda, went to bed around 10:00 p.m. Around midnight, I took about seven or eight Xanax; I think it was seven. I was wanting it to knock me out, but it did the opposite. It got me angry the more I thought about how she treated me. I went into a rage. I used a regular claw hammer with a rubber grip, and the grip was black. They slept in the living room — Brenda and Josh slept in the living room, and I went in with the hammer and hit Brenda in the head first, and then I hit Josh. When I hit her, Josh screamed out, and that’s why I hit him. I turned out the lights and I left. I locked the door. This was around 2:00 a.m. or 3:00 a.m. From there, I went to Latham’s house. I went there because I was going to kill him, too. I got to Latham’s, and I knocked on the door and he let me in. I had the hammer inside my jacket. Latham didn’t know anything was wrong. I told him I was going to go so he could go back to bed. When I got up, I reached in my coat and pulled out the hammer. Latham was behind me, saw it and grabbed it. I let go with my left hand and elbowed him, and I turned around and punched him several times. That’s what happened to my hand. I don’t remember how many times I hit him, and I turned around and punched him several times. That’s what happened to my hand. I don’t remember how many times I hit him, but that’s when I started hitting him with the hammer in the head. I was wanting him to die but he kept breathing and making noises. That’s when I got the knife. I don’t remember which I did first, but I stabbed him in the chest and the throat. I took off the clothes I was wearing and took a shower. I had brought the extra clothes from my house that I put back on. I took his wallet with, I think, about fifty dollars in it. I left and went to the South Pittsburgh/Kimball area. I pulled into a restaurant; I think it was Jack’s. It was on the right side of the road. I pulled into the dumpster and threw away the coat, hammer, knife, my clothes and Latham’s wallet. I rode around for a while, and then I went to Wal-Mart which is where I bought this shirt and other clothes and gifts. I bought them with the money out of La-tham’s wallet. All of this happened between midnight to 5:00 p.m. on Monday. I had my own fifty-dollar gift certificate from Wal-Mart, which I also used. I didn’t start my day planning to kill any *50 one. That’s not me. I guess I got to a breaking point.”
Brownfield made a similar, though not identical statement, to law-enforcement officers on December 26. Brownfield’s statement establishes in detail his recollection of the events surrounding the murders; the statements made to Dr. Clinger some seven months after the murders are general and cursory. Therefore, Dr. Clinger’s testimony with regard to statements made by Brownfield about his activities on the days surrounding the murders, in light of the previously admitted detailed statement Brownfield made to the police, could not have probably injuriously affected Brownfield’s substantial rights.
Finally, the evidence of Brownfield’s guilt as to the capital offenses was overwhelming. The evidence indicated that during the week of December 24, 2001, Brownfield had been using crystal methamphetamine and on the evening of December 24 had consumed several Xanax tablets. After taking the tablets, he became angry at his sister, Brenda McCutch-in, who was sleeping in her bed with her grandson, Joshua Hodges. Brownfield entered the room and beat both Brenda and Joshua with a claw hammer. He then left Brenda’s house and traveled in her car to Latham McCutchin’s house. He entered Latham’s house, and a struggle ensued. Brownfield struck Latham with his fists and the hammer. Brownfield also stabbed Latham in the heart and cut his throat with a knife. When Brownfield left La-tham’s house, he took Latham’s wallet. The evidence further indicated that Brownfield admitted to his ex-girlfriend, Tammy Farmer, that he had killed Brenda, Joshua, and Latham. The results of DNA testing of blood found on Brownfield’s shoes indicated that the blood was Latham’s. Because the evidence was sufficient to prove beyond a reasonable doubt that Brownfield committed the capital offenses, the error in the admission of Dr. Clinger’s testimony was harmless.
The judgment of the Court of Criminal Appeals is affirmed.
AFFIRMED.
COBB, C.J., and LYONS, WOODALL, SMITH, BOLIN, PARKER, and MURDOCK, JJ., concur.
SHAW, J., recuses himself.*

. This case was originally assigned to another Justice on this Court; it was reassigned to Justice Stuart on November 19, 2009.

. Rule 11.2(a) provides:
"(a) Motions.
“(1) Competency to Stand Trial. When a person charged with a crime is before a circuit court, the defendant, the defendant's attorney, or the district attorney may petition for, or the court on its own motion may order, an examination to assist in the determination of the defendant’s present mental condition and competency to stand trial.
"(2) Mental Condition at Time of Offense. If the defendant has timely raised a defense of ‘not guilty by reason of mental disease or defect’ either by the entry of a plea or by filing a pre-trial motion pursuant to Rule 15, the court on its own motion may order, or the defendant, the defendant’s attorney, or the district attorney may move for an examination into the defendant's mental condition at the time of the offense.”

. The murders occurred in the early morning hours of December 24, 2001.

. Tammy Farmer was an ex-girlfriend of Brownfield’s.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).