745 So.2d 899 (1999)
Ex parte T.D.T.
(Re T.D.T. v. State of Alabama).
1980562.
Supreme Court of Alabama.
October 15, 1999.
*900 William M. Dawson of Dawson & Gear, Birmingham, for petitioner.
Bill Pryor, atty. gen., and Hense R. Ellis II, asst. atty. gen., for respondent.
HOOPER, Chief Justice.
T.D.T. was convicted on two counts of child abuse and one count of first-degree sexual abuse. He was sentenced to 10 years' imprisonment for the sexual-abuse conviction and to imprisonment for terms of 10 years and 2 years for the two child-abuse convictions. The trial judge ordered that he serve the sentences consecutively. The Court of Criminal Appeals affirmed. T.D.T. v. State, 745 So.2d 885 (Ala.Crim. App.1998). We granted T.D.T.'s petition for certiorari review. We affirm the judgment of the Court of Criminal Appeals, *901 and we write this opinion primarily to clarify Ala.Code 1975, § 13A-3-24.
T.D.T.'s son testified that T.D.T. routinely punished him by beating him with a belt and that the beatings involved severe physical and mental cruelty. The evidence indicated that when the son was 10 and 11 years old, his father would hit him 20 times with a belt when he crashed his airplane on a video game and would hit him an additional 10 times if he moved while being whipped; that his father stomped on and broke the son's videogame cartridge and whipped him with the game's remote-control device when he defeated his father at a video game; that his father threw him to the ground and hit and kicked him when the child's fishing line broke; that his father hit him and kicked him when he lost the keys to the father's truck, and made him crawl through the woods on his hands and knees looking for the keys, and kicked him and called him a "stupid son of a bitch" as he crawled; that his father kicked him, struck his head against a concrete floor, and called him a "stupid son of a bitch" when he broke some Plexiglas; that his father gave him 30 "licks," broke dishes, and threw the son's supper in the sink when he failed to do chores around the house; and that, as punishment for not playing well, his father refused to let him have a drink of water after a competitive basketball game. After the beatings, his father would tell him that if he told his mother about them he would get 50 more "straps." T.D.T. often made his son lie down over the sofa with his pants down while he administered the whipping. T.D.T.'s son testified that his father would get so angry that he would slobber and foam at the mouth. He also testified as to beatings his father gave to his sister.
T.D.T.'s son testified that he recalled that in the mornings his father often summoned the son's sister to get into bed with him. He testified that he always had to bring his father breakfast in bed and that he regularly saw his sister in bed with his father; he said his father would often tell him to bring him his belt and would then tell him to leave the room.
The son finally told his mother about the abuse. She confronted T.D.T. and told him that the daughter had reported the abuse to a teacher. T.D.T. then whipped the daughter severely; told all of the family members that he hated them; and threatened to shoot the entire family, including himself. The mother and the two children escaped by pretending to take laundry to the car; they were actually putting clean clothes in the laundry baskets.
T.D.T.'s daughter, who was 10 years old at the time of trial, testified that her father would call her to come "snuggle" with him in bed almost every morning. If she did not, she said, then "he would whip [her] with a big thick belt." She testified that her father would rub her stomach and "would push her panties down and rub." She testified that her father would be naked under the covers and that he would rub his penis "around on [her] backside." Her father would threaten to hit her with a belt if she moved. She testified that on one such occasion, when she was nine years old, she saw and felt a creamy white substance on her body near her backside. If her mother came into the room while her father was "snuggling" with her, then her father would quickly move his hand away. He would whip her if she got out of bed to go to the bathroom. She testified that her father would make her mother come into the room to watch them, or "study it" as he called it. Apparently, the mother and father were estranged to the point that they slept in separate bedrooms. The mother testified that she did not think these incidents of the father's "snuggling" with the daughter were sexual but were intended as a means of control, like the incidents she described when the father would force the son to sit and play a video game with him even though the boy would beg to get up. She told T.D.T. that the daughter was getting older and was uncomfortable *902 with the "snuggling." She testified that T.D.T. was having to whip the daughter more and more to get her to come into the bedroom and stay.
T.D.T.'s daughter also testified that her father whipped her to the point of leaving bruises and red marks and soreness. She testified that she was threatened with whipping if she told her mother about the "snuggling." She also testified that she was whipped for not picking newspapers off the floor; for not drinking eggnog; and for forgetting to pick up a washcloth to put in the laundry.
T.D.T.'s wife testified that her husband had frequently whipped the children with a belt, often kicking them while taking them to their room for a whipping; that he frequently called the son a "stupid son of a bitch"; and that the whippings would be for such behavior as not playing a video game well. She said that while T.D.T. was whipping the son, she could hear T.D.T. screaming at him, "You moved. That one didn't count." She testified that on one occasion T.D.T. hit the son in the neck with a belt buckle, causing a large purple blood blister. On another occasion, she said, T.D.T. whipped their son for not catching 20 football passes in a row. She said T.D.T. would hit her or would hit the children harder if she tried to intervene. T.D.T.'s wife further testified that he once tore apart a lighted Santa Claus Christmas decoration to punish the children and that he also once held a gun on his family. She confirmed that T.D.T. had threatened to kill the entire family, including himself, when she told him the abuse had been reported.
T.D.T. testified in his defense that he had never kicked his son or banged his son's head against a concrete floor. He testified that discipline was his responsibility and that he used spankings as a last resort. He testified that his daughter would sometimes crawl into bed with him, but he denied ever touching his daughter with his private parts or in any other inappropriate way.
T.D.T. argues that in charging the jury the trial court erred by not giving the jury a complete reading of § 13A-3-24. We agree. However, we conclude that this error by the trial court did not prejudice T.D.T. We conclude that the jury would have convicted T.D.T. even if the court had read to it the entire Code section.
Section 13A-3-24 is entitled "Use of force by persons with parental, custodial or special responsibilities." It reads:
"The use of force upon another person is justified under any of the following circumstances:
"(1) A parent, guardian or other person responsible for the care and supervision of a minor or an incompetent person, and a teacher or other person responsible for the care and supervision of a minor for a special purpose, may use reasonable and appropriate physical force upon the minor or incompetent person when and to the extent that he reasonably believes it necessary and appropriate to maintain discipline or to promote the welfare of the minor child or incompetent person."
(Emphasis added.) The trial court's instruction to the jury omitted the phrase "he reasonably believes."
The following is an excerpt of the exchange between the trial court and the attorneys:
"[DEFENSE COUNSEL]: Your honor, I have two exceptions to the charges. The first one would be on the charge that the Court made as far as themy requested charge as far as the parent's responsibility of care and supervision. The Code section specifically states that the parent may use reasonable and appropriate physical force upon the
"THE COURT: Give me that section.
". . . .
"[DEFENSE COUNSEL]: Okay. The Code section states that a person responsible *903 for the care and supervision of the minor child may use reasonable and appropriate physical force upon the minor child when and to the extent he reasonably believes it necessary and appropriate to maintain discipline. You left out when `he reasonably believes.'
"THE COURT: I certainly did. And I left it out intentionally.
"[DEFENSE COUNSEL]: Well, the Code section states that. That is in the Code section, and I except to the Court leaving that out.
"[THE COURT]: Well, I'll give you an exception.
"I don't thinkI think these children wereI mean this defendant was charged under [§ ] 26-15-3. And this whole section you read, as I read it, is dealing with discipline and maintaining order, suicide prevention, and medical treatment.
". . . .
"Now, I read you the section with the section where they are charged with, except that I did not give the jury latitude that where `he reasonably believes.'
"[DEFENSE COUNSEL]: That's correct.
"THE COURT: That's right. So you've got an exception to that.
"I don't think that's the law in this case. All he's got to do is reasonably believe that he needs to kick them?
". . . .
[THE PROSECUTOR]: We wouldn't if we asked a defendant, `Do you believe you reasonably used discipline?' and they said, `Yes, I do,' we could never prosecute a child-abuse case
"THE COURT: Well, I don't think you could.
"[THE PROSECUTOR]:if you follow his logic.
"THE COURT: I mean, that saysI understand. That's the rationale like self-defense where a man is caught in an emergency and he reasonably believes somebody is about to go in their pocket and kill him or somebody else. Then yes.
"But here you're talking about a parent who cares for, the supervision, all he's got to do isyou've got to prove it to the jury that he didn't reasonably believe that he needed to kick this boy?
"No, sir, you've got an exception. No need for us to quibble about it further."
(C.R.488-92.)
The plain meaning of the wording used in a statute will govern this Court's interpretation of the statute:
"`Words used in a statute must be given their natural, plain, ordinary and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect.'"
Blue Cross & Blue Shield v. Nielsen, 714 So.2d 293, 296 (Ala.1998) (quoting IMED Corp. v. Systems Eng'g Assocs. Corp., 602 So.2d 344, 346 (Ala.1992)).
The language and purpose of § 13A-3-24 are not ambiguous. The Legislature intended, by enacting this statute, to protect parents and guardians from being prosecuted for assault when they use reasonable physical discipline upon the minors in their charge. The Legislature used the phrase "he reasonably believes" because different families use different forms of corporal punishment upon the children in their charge. What is reasonable discipline to one family may be excessive force to another family. While the State argues that we should not use the subjective understanding of the defendant to determine what is or is not "reasonable ... physical force," the State's interpretation would require the courts to use the prosecutor's subjective understanding of what "reasonable force" is. Instead of the local community's standard, as understood by the jury, *904 the court would use the prosecutor's understanding of when force used against a child constitutes child abuse. To this Court, such an interpretation directly undercuts the purpose of the statute, i.e., to prevent the prosecution of parents by overzealous prosecutors. We believe a jury is capable of ascertaining the belief of a defendant and distinguishing that belief which is reasonable from that which is unreasonable.
This Court and the other courts of this State frequently use the words "reasonably" and "reasonable" to determine whether someone's behavior is acceptable under the law. Both the trial court and the prosecutor interpreted the phrase "he reasonably believes" in a very subjective fashion that would have the effect of changing the standard set by the Legislature. In other words, the State's argument was that if T.D.T. believed that he was simply disciplining his children, no matter how cruelly, then he could never be prosecuted. We do not think the statute is to be read so subjectively. The word "reasonably" states an objective standard by which the jury is to determine what the average, "reasonable," person would consider to be an acceptable form of punishment or discipline for his or her child.
Did the defendant's behavior constitute "reasonable" discipline under the circumstances? The Court of Criminal Appeals stated in its opinion that a verbatim recitation of the statute "would place an undue burden of proof on the State." 745 So.2d at 897. An objective standard does not present an excessive burden for the prosecution. The trial judge's example of self-defense supports defense counsel's argument that the entire statute should have been read. Chavers v. State, 361 So.2d 1106, 1107 (Ala.1978); Ex parte Pettway, 594 So.2d 1196, 1201 (Ala.1991) ("`the question is not merely what the defendant believed, but also, what did he have the right to believe'"; jury had responsibility for determining validity of self-defense argument if there was any evidence to that effect). In this case, T.D.T. testified that he thought he was using appropriate and reasonable discipline when he used physical force upon his children. In light of the statute, it was incumbent upon the jury to determine whether the defendant reasonably believed the force was reasonable. Even if this Court did consider the statute to place an undue burden upon the State in prosecuting a child-abuse case, it is not the duty of this Court to question the wisdom, or the lack thereof, used by the Legislature in enacting the laws of this State.
Although the trial court erred in not including the phrase "he reasonably believes" in the jury instruction, the error was harmless. Rule 45, Ala.R.App.P., specifically states:
"No judgment may be reversed or set aside, nor new trial granted ... on the ground of misdirection of the jury ..., unless in the opinion of the [appellate] court ..., it should appear that the error complained of has probably injuriously affected substantial rights of the parties."
Based on our review of the record, we conclude that the trial court's failure to include in its instruction the full text of the statute was not so pivotal to the jury's decision-making process as to call into question the jury's verdict convicting T.D.T. Ample evidence in the record would have allowed the jury to determine whether T.D.T.'s actions were of an appropriate nature for a father to use in disciplining his child. In spite of the incomplete instruction, we do not believe the jury would have convicted T.D.T. if it had believed that he had "reasonably" disciplined his children. The evidence overwhelmingly indicated that T.D.T. did in fact use unreasonable physical force. Manuel v. State, 711 So.2d 507 (Ala.Crim.App.1997) (erroneous jury instruction was harmless error because the evidence of the defendant's guilt was overwhelming).
*905 We disagree with the trial court's suggestion that giving an instruction containing the full text of the statute would place an undue burden upon the State. Given the evidence in this case, we do not consider it likely that the jury would have acquitted T.D.T. even if the judge had included the words "he reasonably believes" in his instruction to the jury. Testimony of the witnesses reveals numerous instances of "discipline" administered by T.D.T. to his children that went far beyond what any person would consider to be "reasonably" necessary in any given situation.
Because T.D.T. raised the issue of reasonableness regarding his administration of discipline upon the children, the trial judge erred by not including the words "he reasonably believes" in its instruction regarding § 13A-3-24, Ala.Code 1975. However, the error was harmless. Therefore, we affirm T.D.T.'s convictions.
We briefly address three other arguments raised by T.D.T. in his petition for the writ of certiorari, to explain why we conclude that the Court of Criminal Appeals decided those issues correctly.
First, the trial court properly refused to charge the jury on the offense of assault in the third degree because, under the particular facts shown by the evidence in this case, T.D.T. was guilty either of child abuse or of no crime at all. T.D.T. admitted to striking the children as a form of discipline, but he denied some of the severe abuse alleged by the children. He argues that "the jury should have been allowed to consider whether [he,] `with intent to cause physical injury to another person, [caused] physical injury to any person,'" quoting § 13A-6-22(a)(1), Ala. Code 1975. If the jury had believed T.D.T. and found he was simply disciplining his children, then the jury would have had to acquit him. If the jury believed the children and found that T.D.T.'s actions were not discipline, then the actions constituted child abuse. In other words, had the jury found that T.D.T. intended to cause physical injury to his children when he hit them, then the jury would necessarily have had to find T.D.T. guilty of "child abuse," which includes the "willful abuse" or "cruel beating" of a child by a "responsible person." § 26-15-3, Ala.Code 1975. Therefore, the refusal to instruct the jury on third-degree assault was not error.
Second, T.D.T. argues that statements made by the children to a school counselor and to an interviewer at Prescott House were inadmissible hearsay and that the admission of these statements constitutes reversible error. We conclude that, even if these statements did constitute inadmissible hearsay, the trial court's admission of these statements was harmless error. The portion of the counselor's testimony that T.D.T. says presented improper hearsay involved statements by T.D.T.'s son shortly after he, his sister, and his mother moved out of the house, statements to the effect that, although he had been frightened, he had finally "gotten up his nerve" to tell his mother that his father had been beating him. The counselor's testimony did not give any further detail about the statements the son had made to her. After the son talked to the school counselor, the counselor telephoned the Department of Human Resources and the son had an interview with an employee of Prescott House, a facility for interviewing abused children. The interviewer did not testify as to any statements the son made to her, but the court allowed into evidence a videotape recording of the interview.
"There are numerous factors which can be considered in assessing harmless error [in regard to hearsay statements], including `the importance of the [declarant's] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the [declarant] on material points, ... and the overall strength of the prosecution's case.' Delaware v. *906 Van Arsdall, 475 U.S. [673], 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 [(1986)]."
James v. State, 723 So.2d 776, 782 (Ala. Crim.App.), cert. denied, 723 So.2d 786 (Ala.1998). In this case, the testimony of the counselor and the interviewer was not important to the prosecution's case, because their testimony was cumulative and the information supplied by it was fully encompassed by the son's testimony.
In King v. King, 636 So.2d 1249 (Ala. Civ.App.1994), the Court of Civil Appeals addressed a similar issue in a child-custody case, stating:
"The husband contends that the trial court erred in permitting two school counselors to testify regarding statements that the minor daughter made to them. The testimony objected to was very brief, and any information gleaned from it was fully encompassed by the testimony of the child. Even if the court erred in overruling the husband's objections, the minor child had already testified to the matter; thus, the testimony was merely cumulative, and the error was harmless."
636 So.2d at 1252.
The facts in King are similar to the facts in this case. The testimony objected to was very brief. In fact, the trial court interceded at several points during the testimony to ensure that no overly prejudicial statements were admitted. Further, the child had already testified about his father's abuse and had stated that his testimony was substantially the same as what he had told the counselor and the interviewer. Therefore, the testimony objected to was cumulative. We also note that in this present case the trial court gave a detailed limiting instruction to the jury before these witnesses testified, telling the jury that these witnesses' testimony regarding the statements was not offered to prove the truth of those statements. Therefore, even if the trial judge improperly admitted this testimony, any error resulting from its admission was harmless and does not require a reversal.
Finally, T.D.T. argues that the admission of a videotaped interview of his son at Prescott House constitutes reversible error. The Court of Criminal Appeals upheld the trial court's admission of this videotape on the grounds that it was a prior consistent statement admitted to rebut the charge of improper influence by the mother. On this videotape, T.D.T.'s son described various instances of abuse, to which he also testified at trial. T.D.T.'s son also described on this videotape other events that were not relevant to the charges against T.D.T. For example, T.D.T.'s son described instances of abuse by T.D.T. against his wife. Other evidence presented at trial showed that some of the son's statements on the videotape were false, tending to bolster the defense's charge that the mother had improperly influenced the children's testimony. We conclude that even if the trial court did improperly admit the videotaped interview, its admission was harmless error because, even without it, the record contains overwhelming evidence of T.D.T.'s guilt. See Hellums v. State, 549 So.2d 611 (Ala.Crim. App.1989) (admission of testimony concerning alleged threats by murder defendant against his son was harmless error in light of the strong evidence of the defendant's guilt); Gardner v. State, 530 So.2d 250 (Ala.Crim.App.1987) (improper admission of fingerprint card was harmless error in view of the other evidence against the defendant); Baker v. State Dep't of Human Resources, 533 So.2d 633 (Ala.Civ. App.1988) (admission of tape in parental termination hearing containing allegations that mother had sexually abused the child was not reversible error where evidence was cumulative and there was ample evidence other than the tape to uphold trial court's decision); Muncher v. Muncher, 509 So.2d 250 (Ala.Civ.App.1987) (admission of hearsay testimony was merely error without injury because the record contained sufficient evidence to uphold the trial court's ruling, without regard to that testimony).
*907 Further, T.D.T. has failed to demonstrate how the admission of this evidence was prejudicial to him. "When the evidence of the defendant's guilt is strong, the defendant must show that the trial court's error was prejudicial." Ex parte Harris, 428 So.2d 124, 125 (Ala.1983). "[A]n error that might have been prejudicial in a close case does not require reversal when the evidence of the defendant's guilt is strong." Johnson v. State, 484 So.2d 1121, 1123 (Ala.Crim.App.1985). This Court will not reverse a criminal conviction without a showing that the error complained of has probably had an injurious effect. Rule 45, Ala.R.App. P. See Johnson v. State, 484 So.2d 1121 (Ala. Crim.App.1985).
AFFIRMED.
MADDOX, HOUSTON, COOK, SEE, and LYONS, JJ., concur.
JOHNSTONE and ENGLAND, JJ., dissent.
BROWN, J., recuses herself.
JOHNSTONE, Justice (dissenting).
I respectfully dissent. The learned trial judge erred to reversal in three of his rulings.
First, the trial judge did err in refusing to instruct the jury on assault in the third degree as a lesser offense included within the charged crime of child abuse. While the record contains plenty of evidence to convict the defendant of child abuse, as he was charged and convicted, nonetheless, the record contains countervailing evidence, as the opinion issued by the Court of Criminal Appeals acknowledges in these words:
"T.D.T. testified in his defense that he had never kicked his son or banged his son's head on a concrete floor. He testified that discipline was his responsibility, but that he used spankings only as a last resort. (R. 384.) He testified that his daughter would sometimes crawl into bed with him, but he denied ever touching his daughter with his private parts or in any other inappropriate way."
T.D.T. v. State, 745 So.2d 885, 889 (Ala. Crim.App.1998). In affirming the trial judge's refusal to instruct the jury on the lesser included offense of assault in the third degree, the Court of Criminal Appeals and the majority of this Court disregard the prerogative of the jury to believe some of the prosecutor's evidence but not all of it as it pertains not only to the existence of the essential elements of the respective crimes but also to the nature and severity of those elements. The majority of this Court holds:
"If the jury had believed T.D.T. and found he was simply disciplining his children, then the jury would have had to acquit him. If the jury believed the children and found that T.D.T.'s actions were not discipline, then the actions constituted child abuse. In other words, had the jury found that T.D.T. intended to cause physical injury to his children when he hit them, then the jury would necessarily have had to find T.D.T. guilty of `child abuse,' which includes the `willful abuse' or `cruel beating' of a child by a `responsible person.' § 26-15-3, Ala.Code 1975. Therefore, the refusal to instruct the jury on third-degree assault was not error."
745 So.2d at 905. This holding ignores Updyke v. State, 501 So.2d 566 (Ala.Crim. App.1986), which, diametrically to the contrary, specifically holds that a trial court errs to reversal in refusing an instruction on third-degree assault as a lesser included offense of child abuse when the evidence proves the child has been beaten. The Court of Criminal Appeals followed this holding in likewise reversing another child-abuse conviction in Miller v. State, 565 So.2d 275 (Ala.Crim.App.1989).
The law on the quantum and tendency of evidence that entitle a defendant to an instruction on a lesser included offense is contained in the case of Boyd v. State, 699 So.2d 967 (Ala.Crim.App.1997), as follows:

*908 "`A defendant accused of a greater offense is entitled to have the trial court charge on any lesser included offense if there is any reasonable theory from the evidence to support the lesser charge, regardless of whether the state or the defendant offers the evidence. Ex parte Pruitt, 457 So.2d 456 (Ala.1984); Parker v. State, 581 So.2d 1211 (Ala.Crim.App. 1990), cert. denied, 581 So.2d 1216 (Ala. 1991). A court may properly refuse to charge on a lesser included offense ... when ... it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense.... Anderson v. State, 507 So.2d 580 (Ala.Crim.App. 1987)....'" (Emphasis added.)
699 So.2d at 972 (quoting Breckenridge v. State, 628 So.2d 1012, 1016 (Ala.Crim.App. 1993)). A defendant is entitled to a jury instruction submitting a lesser included offense for consideration by the jury even though the evidence supporting the theory of that lesser included offense may be "weak, insufficient, or doubtful in credibility." Chavers v. State, 361 So.2d 1106, 1107 (Ala.1978). See also Deming v. City of Mobile, 677 So.2d 1233, 1235 (Ala.Crim. App.1995).
The effort by the Court of Criminal Appeals, in its opinion on the case before us, to distinguish Updyke, supra, is ineffectual inasmuch as the purported distinctions are merely recitations of more and worse evidence of child abuse in the case before us than in Updyke. The defendant's entitlement to the instruction on the lesser included offense is established by the existence of the countervailing evidence, regardless of any comparison between the weight of the evidence on one side of the issue and the weight of the evidence on the other side. Deming and Chavers, supra.
Second, the trial court further erred by admitting, over the defendant's objection, a videotaped interview of the defendant's teenage son, one of the alleged victims. The Court of Criminal Appeals approved the State's offer of this videotape under Rule 801(d)(1)(B), Ala. R. Evid., allowing out-of-court declarations "consistent with the declarant's testimony and ... offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." Some of the boy's videotaped statements, however, were not consistent with his testimony but were beyond it in scope and substance and were highly prejudicial, as these excerpts demonstrate:
"Interviewer: [Your sister] and I have been talking about some things that have been happening at home. Can you tell me what you know about it?
"Son: ... He [T.D.T.] broke it [a Nintendo video game]. Mommy told him to buy me another one [Nintendo] because I had bought it with my own money. And then he went to the store one day, he went to the Kmart one day and he bought a brand-new Nintendo, a good Nintendo, and it came with two games and he took it home. And what he did was he got the brand-new Nintendo and he put the old one in the box without the two games and he took it back and got all of his money back and he said that the two games wasn't in there.
". . . .
"Interviewer: Did you ever go to the doctor or go to the emergency room or
"Son: No. No. I've been to the doctor but we didn't tell him what the cause was from, we lied about that cause we didn't wantI guessto be embarrassed about anything like that.
"Interviewer: What did you go to the doctor about the time that you didn't tell him what caused it?
"Son: I'd got a real bad headache from my Dad's dad he hadI couldn't lie on my back, I couldn't swallow pills up in Maryland and my Dad's dad, my grandfather had getting his finger and poking it and put pills in my mouth and was poking them down my throat with his *909 finger and it was choking me. That night I had a real bad headache and it lasted about two hours, I was just screaming cause I had a bad headache cause that idiot had been poking pills down me.
"Interviewer: And that's when you went to the doctor?
"Son: Yeah.
"Interviewer: That's the time you didn't tell him [the doctor] what had caused it because you were embarrassed?
"Son: Shakes head affirmatively
"Interviewer: Had your Dad done anything that time or was it your granddaddy that was poking the pills?
"Son: My Dad, well both really.
"Interviewer: What had you Dad done?
"Son: My Dad was just screaming at me and he'd make every one leave the room and he'd have his belt off and he'd say that if I didn't swallow the pill he would whip me. I have a pill in my mouth, I didn't swallow it, it was just dissolving in there.
". . . .
"Interviewer: What happened to cause y'all to leave or get out, did something happen or
"Son: No. I mean he was real, real mad that day and he's been just shut up in his bedroom and he been real, real mad oversee he'd bought this computer game that had naked women on it and he was just flipping `em, he had just a little mouse and he was just flipping `em, and it was just like January and February and all them and he was just watching it. And them, one of them, said are you going to burn the midnight oil or what you burning. Then Mommy said something, she said cut that off there's kids in here. He got real mad and he just threw her on the sofa and began banging her with his fists into her legs and a stuff. It lasted a while, a long while and then he justhe'd be real mad.
". . . .
"Son: And one time, its been a while back, he's, he's got real mad at Mommy before, and he's hadhe's, he'sa while back before I was even born [emphasis added], Mommy had tried to leave Mommy had left him because he'd done some things, I know cause I know why we left him. Because Mommy was going to have a baby, she was pregnant, and Daddy had hit her in the stomach somehow and it killed the baby and they had to remove it and after that Mommy left him. And then Daddy came over there with a rifle and held it on Big Mama, Big Mama's my grandmother, Mommy's mom, and held it on Big Mama and forced Mommy to come home.
". . . .
"Interviewer: Is there anything else that happened, that we haven't talked about?
"Son: Ah yeah um, this is the Christmas decorations this year, we had Christmas decorations up everywhere and um and my umthis is, this is about that um, my Dad had on that program with naked women and stuff and um my Mom said something and he got real mad....
"Interviewer: Did he ever um let you look at the naked women in the computer program or did he ever show you other kinds of pictures like that or any movies or anything like that?
"Son: Uh-uh, uh-uh, uh-uh [indicating the negative]. He showed it to me when he bought it. He'd bought it, he'd bought it, then he showed it to me. No, he didn't show it to me, he'd put it under his computer.
"Interviewer: What did he show to you?
"Son: He didn't show it to me.
"Interviewer: Did he show you the box or
"Son: I saw a box
"Interviewer: What did he show to you?
"Son: He'd hid it, he'd tried to hide it under his computer and one day I was *910 vacuuming and looked under the computer and I saw it. I didn't say anything about it cause I know Mommy would get mad and then and then be another argument, so I just didn't say anything and a while, a little later he got it out and loaded it. And then [sister] saw, we both saw, and [sister] came in there and saw it and [sister] showed me and then I saw it and I think that [sister] told Mommy and Mommy saw it. Then Mommy went over there looking at it. Mommy didn't look at, she was just sitting in, watching it in the living room and Daddy was just clicking the thing and it showed Miss January, February, March, April, May, June, July, all them.
"Interviewer: Where were y'all when he was doing that?
"Son: In the living room too.
"Interviewer: So you could see it, you were able to see it.
"Son: Yeah.
"Interviewer: Did he have any magazines with stuff like that in it or?
"Son: I don't know.
"Interviewer: Did he have any movies, videos that he watched with stuff like that in it?
"Son: Yeah.
"Interviewer: Did you ever see any of those?
"Son: Uh-uh [indicating the negative], I haven't. He'd tell [sister] and me to go to bed, but I could hear it."
The erroneous admission of these videotaped statements cannot be validly dismissed as harmless error on the premise that the legal evidence in this case was strong or overwhelming, for such a premise begs the question. The only evidence against the defendant consisted of or derived from the words of the defendant's wife and two childreneither their words in the form of their in-court testimony or their words as related or analyzed by the other witnesses. The fundamental question to be decided by the jury was whether those words were true. If we characterize the evidence in this case as strong or overwhelming, we are assuming that those words are true. If we respect the prerogative of the jury to find the words to be false, we cannot say the evidence is strong or overwhelming. A holding that the admission of this videotape is harmless is tantamount to a holding that, since the defendant's wife and children had spoken many adverse words about him, more and worse adverse words could not hurt. Obviously the illegally admitted inflammatory contents of the videotape increased the likelihood that the jury would find the words of the defendant's wife and children to be true.
Third, I respectfully dissent from the holding of the majority that the trial judge's omission of the words "reasonably believes" from his instruction on parental discipline pursuant to § 13A-3-24, Ala. Code 1975, was harmless error. The parental discipline statute requires the State to prove not only that the parent's acts were unreasonable but also that the parent's beliefs about those acts were unreasonable. The majority holding that the trial judge's omission of the words "reasonably believes" from his jury instruction was harmless confuses these two essential elements of the case against the parent, subtracts from the requisite proof the essential element of the unreasonableness of the parent's beliefs regarding his acts, and thereby contradicts the initial holding that "the trial court erred in not including the phrase `he reasonably believes' in the jury instruction." 745 So.2d at 904. The elimination of this element is tantamount to a holding, contrary to law, that the jury could not believe some of the prosecutor's evidence without believing all of it and therefore could not possibly find the defendant's beliefs to be reasonable.
Finally, the trial judge committed still another error, one which did not necessarily prejudice the defendant but which does need discussion to correct the analysis by the Court of Criminal Appeals. The trial *911 judge did err in allowing, over the defendant's objection and without the predicates required by §§ 15-25-31 and 15-25-32, Ala.Code 1975, the witness, a school counselor, to testify to out-of-court statements supposedly made by the defendant's teenage son. The Court of Criminal Appeals opines that these statements were not hearsay because, as the State contended at trial,
"[t]he State was not trying to prove the truth of the matter asserted in the statements to the children's school counselor or the interviewer, but, rather to show what instigated the investigation that resulted in the charges against T.D.T. and what led school officials to contact the Department of Human Resources."
T.D.T., 745 So.2d at 894. The problem with this analysis is that "what instigated the investigation ... and ... led school officials to contact the Department of Human Resources" was not material to any issue in the case, as the investigators and school officials were not on trial.
The admission of this testimony cannot be excused by the hearsay-rule exception allowing proof of a prior consistent statement to rebut a charge of recent fabrication by a witness. The theory of this exception is that a witness's having previously made a statement outside of court consistent with his or her testimony in court tends to rebut a charge that the witness fabricated the testimony in the interim and therefore tends to prove the truth of the witness's in-court testimony. The truth of the matter stated by the witness in the prior consistent statement is essential to this theory, inasmuch as the purpose of introducing the prior consistent statement is to prove the truthfulness of the witness's in-court testimony. The State would hardly contend that it could rehabilitate its witness by introducing a prior consistent false statement uttered outside of court by that witness. The trial court in the case before us, however, specifically foreclosed the jury from considering the testimony at issue for the truth of the matter stated outside of court by the alleged minor victims. The trial judge, consistently with the immaterial purposes for which the State told him it was offering the testimony, gave the jury a limiting instruction as follows:
"THE COURT: Ladies and gentlemen, let me give you some limited instructions. I believe you will hear some testimony now on conversations that took place allegedly between the alleged victims and this counselor.
"Now, the Court will allow you to hear that. But you do not consider itI'm not allowing it in for the truth of what's contained in the statements. Do you follow me? I'm allowing it in to show the status or state of mind that existed, perhaps.
"And I'll try to give you an example. Let us say we were trying a man to see if he was insane. That was the issue. And somebody comes in and says: I saw him out in the park yesterday. And he was out there screaming and preaching and saying he was God. We would allow that in, not for whether or not he's God. Do you follow me? That's what he's saying. But whether or not you can consider it in determining whether he's insane.
"Now, I don't think you're going to hear anything you haven't heard already. But I will allow the counselor to testify that certain statements were made to her. It doesn't necessarily mean they're true." (R. 282-83.) (Emphasis added.)
The trial court thereby eliminated from consideration by the jury the only arguably material purpose for this testimony and left for the jury only the immaterial and prejudicial purposes of showing, in the words of the Court of Criminal Appeals, "what instigated the investigation that resulted in the charges against T.D.T. and what led school officials to contact the Department of Human Resources."
As a practical matter, however, the particular statements by the defendant's teenage *912 son, as recounted by the witness to the jury, were comparatively innocuous and were cumulative with the boy's own in-court testimony. Thus this particular error does not require reversal, although the first three errors discussed in this dissent do.
ENGLAND, J., concurs.