LYONS, Justice.
 

 Michael Brown was convicted of two counts of capital murder for the killing of Betty Kirkpatrick. The murder was made capital because it was committed during the course of a robbery and a burglary. The jury recommended by a vote of 11-1 that Brown be sentenced to death, and the trial court followed the jury’s recommen
 
 *935
 
 dation. Brown appealed. The Court of Criminal Appeals unanimously affirmed Brown’s conviction and sentence.
 
 Brown v. State,
 
 11 So.3d 866 (Ala.Crim.App.2007). Brown petitioned this Court for certiorari review; we granted his petition to review one issue: whether the Court of Criminal Appeals correctly concluded that certain out-of-court statements were admissible under the doctrine of curative admissibility. For the reasons discussed below, we need not decide that issue to affirm the judgment of the Court of Criminal Appeals.
 

 I.
 
 Facts and Procedural History
 

 The following facts are from the Court of Criminal Appeals’ opinion:
 

 “The State’s evidence tended to show the following. On October 12, 2001, Ricky Kirkpatrick and his wife discovered the body of his 65-year-old mother, Betty Kirkpatrick, in her mobile home in Hueytown. Her head was covered with a plastic bag and her throat had been cut. A knife and a paper towel were lying on her chest. Betty Kirkpatrick’s purse and her gold 1986 Ford Thunderbird automobile were missing. The forensic pathologist testified that Betty Kirkpatrick died of ‘asphyxia by strangulation and smothering.’ (R. 481.) She also had bruises on her face and hands that, he said, were caused by blunt-force trauma.
 

 “Several witnesses testified that they saw Brown driving a gold Thunderbird around the time of the murder. Alisha Spindlow testified that she saw Brown driving a gold Thunderbird and that he told her that he had killed Betty Kirkpatrick. Another individual, Kevin Clayton, testified that he saw Brown two days after the murder, that he was driving a gold Thunderbird, and that he told him that he got the car from a lady and the car would not be ‘hot’ until the lady’s body was discovered. Kelly Watkins said that Brown was driving a gold Thunderbird around the time of the murder and that he told her that he had killed the lady who owned it. Watkins said that Brown told her that he had tried to choke the victim but she would not die so he cut her throat with a knife he got from the kitchen of her house.
 

 “Forensic tests were also conducted on the bloodstains found on the paper towel discovered on Betty Kirkpatrick’s chest. Carl Mauterer, a forensic scientist with the Alabama Department of Forensic Sciences, testified that one stain was tested and found to be consistent with Brown’s blood — Brown could not be excluded as the donor.
 

 “Detective Charles Hagler also testified that Brown told him that he went to Betty Kirkpatrick’s mobile home with three other individuals, Robert Smith, Kevin Clayton (who testified at Brown’s trial), and Moses Smiley, to rob Betty Kirkpatrick but that Robert Smith killed Kirkpatrick.”
 

 Brown,
 
 11 So.3d at 875.
 

 II.
 
 Standard of Review
 

 “ ‘This Court reviews pure questions of law in criminal cases de novo.’ ”
 
 Ex parte Morrow,
 
 915 So.2d 539, 541 (Ala.2004) (quoting
 
 Ex parte Key,
 
 890 So.2d 1056, 1059 (Ala.2003)). However, because Brown was sentenced to death, the Court of Criminal Appeals reviewed the proceedings for plain error.
 

 “Plain error is defined as error that has ‘adversely affected the substantial right of the appellant.’ The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Su
 
 *936
 
 preme Court stated in
 
 United States v. Young,
 
 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is ‘particularly egregious’ and if it ‘seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.’ See
 
 Ex parte Price,
 
 725 So.2d 1063 (Ala.1998), ce
 
 rt. denied,
 
 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed2d 1012 (1999).”
 

 Hall v. State,
 
 820 So.2d 113, 121-22 (Ala.Crim.App.1999) (additional citations omitted). See also
 
 Ex parte Walker,
 
 972 So.2d 737, 742-43 (Ala.2007).
 

 III.
 
 Analysis
 

 In his petition for a writ of certiorari, Brown argues that the admission of out-of-court statements at his trial violated his right to cross-examination and that the statements were not admissible under the doctrine of curative admissibility. Brown states that the State’s theory of the case is that he acted alone in robbing and killing the victim, while the defense theory is that, although Brown was present at the scene, he did not kill Kirkpatrick. Instead, Brown said, three people in addition to him were at the scene, and one of them, Robert Smith, killed her. Brown states that the defense theory of the case was supported by the State’s evidence in that his prints did not match any of the readable prints from the victim’s car; DNA from a cigarette found in the ear excluded both the victim and Brown; and, of two DNA samples collected from the blood on a paper towel found at the murder scene, one excluded Brown and the other included the DNA of at least two individuals, although it did not exclude Brown.
 

 During the testimony of the lead investigative officer, Detective Charles Ha-gler, the prosecutor, without objection from Brown, elicited evidence that Smith had made out-of-court statements denying his involvement in the crime and implicating Brown. Brown argues that, because he had had no opportunity to cross-examine Smith, his constitutional right to confront witnesses was violated. Brown relies upon
 
 Crawford v. Washington,
 
 541 U.S. 36, 59, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), which holds that “[tjestimonial statements of witnesses absent from trial have been admitted only where the declar-ant is unavailable, and only where the defendant has had a prior opportunity to cross-examine.”
 

 The Court of Criminal Appeals concluded that the content of Smith’s statements was admissible under the doctrine of curative admissibility, reasoning that defense counsel’s cross-examination of Ha-gler opened the door for the prosecutor, on redirect, to elicit the content of Smith’s out-of-court statements implicating Brown in the murder. Brown argues that Ha-gler’s testimony regarding Smith’s statements violated
 
 Crawford,
 
 in which the United States Supreme Court held that “[wjhere testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation.” 541 U.S. at 68-69, 124 S.Ct. 1354. Therefore, Brown argues, the Court of Criminal Appeals erred in admitting Smith’s statements under the doctrine of curative admissibility.
 

 Brown states that in response to the prosecutor’s questions Hagler testified that Smith adamantly stated that he was not involved in Kirkpatrick’s murder, gave him names of people he was with on the night she was murdered, and specifically implicated Brown in the murder. The admission of these statements, Brown insists, violated his right to cross-examine Smith because, he says, Smith’s statements were clearly testimonial, the State failed to establish that Smith was an unavailable wit
 
 *937
 
 ness, and the defense had had no prior opportunity to cross-examine Smith. The Court of Criminal Appeals concluded:
 

 “Here, the defense counsel implied on cross-examination that Det. Hagler acted irresponsibly in not investigating Robert Smith. To rebut the matters that were presented on cross-examination the State had a right to question Det. Hagler so that Det. Hagler could explain his actions during the course of the investigation. Under the caselaw cited above, we hold that there was no error, much less plain error.”
 

 Brown,
 
 11 So.3d at 905. Brown argues that the above holding by the Court of Criminal Appeals conflicts with Alabama cases establishing that the doctrine of curative admissibility is applicable only where the opposing party has introduced illegal or otherwise inadmissible evidence. See, e.g.,
 
 Ex parte D.L.H.,
 
 806 So.2d 1190, 1193 (Ala.2001); and
 
 Varner v. State,
 
 497 So.2d 1135, 1138 (Ala.Crim.App.1986).
 

 In this case, Brown says, the subject of Hagler’s investigation was never a forbidden area of inquiry for either party, being the primary topic of his testimony during the State’s direct examination; therefore, Brown says, it was not necessary for defense counsel to “open the door” on cross-examination in order for the investigation to be an appropriate subject on redirect. Brown alleges that defense counsel’s questioning of Hagler was a direct response to the State’s examination and thus was classic impeachment. Specifically, Brown says he never elicited testimony from Hagler as to what Smith told him during questioning and thus never opened the door to such testimony on redirect by the prosecutor. Brown argues that it would have been proper for the State to elicit testimony from Hagler that he had investigated and questioned Smith and later determined that he was not a suspect without introducing Smith’s statements implicating Brown in the offense, but that the State was not entitled to rebut defense counsel’s effort to impugn the sufficiency of Hagler’s investigation by introducing the statements of other suspects. According to Brown, the statements at issue in this case, like those in
 
 Crawford,
 
 directly undermined the defense theory and thus were severely prejudicial to Brown. Given that Brown’s defense centered around the possibility that Smith was the party responsible for the murder, Brown maintains that Hagler’s testimony as to what Smith said allowed the State to argue in its closing that Brown was solely responsible for Kirkpatrick’s death and that there was no evidence to support the defense theory that Smith was involved in the murder.
 

 The Court of Criminal Appeals stated in its opinion that the record shows that during direct examination Hagler testified that Brown told him that he and three other individuals were involved in the robbery but that Smith had committed the murder. He did not mention any statements that Smith had made to police or even mention that Smith had been questioned by police. During cross-examination, the Court of Criminal Appeals said, defense counsel elicited testimony that Smith had been questioned by police; that his statement had been audiotaped; that Smith had been read his
 
 Miranda
 
 rights and had signed a waiver-of-rights form; that Hagler had not submitted Smith’s fingerprints for comparison with the fingerprints discovered in the victim’s car and that when Hagler obtained a warrant for a sample of Brown’s blood, he stated in his affidavit supporting the warrant that Brown had stated that he and three others had entered the victim’s residence to rob her; that one of the other suspects had choked the victim and cut her throat; and that they then had taken her purse, jewelry, and car. On redirect, the prosecutor
 
 *938
 
 asked Hagler whether Smith said anything to him about being involved in the victim’s death, and Hagler answered:
 

 “ ‘He was adamant that he was not involved. He gave the names of people that he was with ... who verified where he was during the night of the evening in question. And he also said that Mr. Brown had made statements about the murder.’ ”
 

 Brown,
 
 11 So.3d at 903. The Court of Criminal Appeals then went on to discuss the doctrine of curative admissibility.
 

 Because Brown failed to object to the testimony he now challenges, our review is limited to an examination for plain error. See Rule 45A, Ala. R.App. P. Brown argues in his initial brief to this Court that the Court of Criminal Appeals’ conclusion that the admission of testimonial out-of-court statements was not error under the doctrine of curative admissibility conflicts with established law. In its responsive brief, the State argues that this Court need not reach the merits of Brown’s argument because, it argues, even if the admission of Hagler’s testimony regarding Smith’s statements was erroneous, any error was harmless and certainly does not rise to the level of plain error.
 

 “ ‘To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s “substantial rights,” but it must also have an unfair prejudicial impact on the jury’s deliberations.’ ”
 
 Ex parte Bryant,
 
 951 So.2d 724, 727 (Ala.2002) (quoting
 
 Hyde v. State,
 
 778 So.2d 199, 209 (Ala.Crim.App.1998)). In
 
 United States v. Young,
 
 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the United States Supreme Court, construing the federal plain-error rule, stated:
 

 “The Rule authorizes the Courts of Appeals to correct only ‘particularly egregious errors,’
 
 United States v. Frady,
 
 456 U.S. 152, 163 (1982), those errors that ‘seriously affect the fairness, integrity or public reputation of judicial proceedings,’
 
 United States v. Atkinson,
 
 297 U.S. [157], at 160 [ (1936) ]. In other words, the plain-error exception to the contemporaneous-objection rule is to be ‘used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.’
 
 United States v. Frady,
 
 456 U.S., at 163, n. 14.”
 

 See also
 
 Ex parte Hodges,
 
 856 So.2d 936, 947-48 (Ala.2003) (recognizing that plain error exists only if failure to recognize the error would “seriously affect the fairness or integrity of the judicial proceedings,” and that the plain-error doctrine is to be “used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result” (internal quotation marks omitted)).
 

 The State argues that in order to establish that the admission of the testimony was plain error, Brown must show that the admission of Hagler’s testimony concerning Smith’s statements was “particularly egregious” and “seriously affeet[ed] the fairness, integrity or public reputation of [his trial].” In addition, Brown must establish that the admission of this testimony “had an unfair prejudicial impact on the jury’s deliberation.”
 
 Ex parte Price,
 
 725 So.2d 1063, 1072 (Ala.1998). The State maintains that because it presented overwhelming evidence proving that Brown murdered Kirkpatrick, Brown cannot establish that the admission of Hagler’s testimony had any impact on the jury’s deliberation.
 

 Assuming, without deciding, that the testimony would have been inadmissible on proper objection, the State’s evidence showed that Brown admitted to being in Kirkpatrick’s mobile home when the murder occurred and that he drove her car and boasted to his friends how he had
 
 *939
 
 killed her. He told a friend that when he was unable to choke the victim, he got a knife from her kitchen and slit her throat but that there would be no fingerprints on the knife because he had wrapped the handle with a paper towel, which was discovered at the murder scene. The Alabama Department of Forensic Sciences determined that Brown was a possible donor of DNA recovered from the paper towel. The State argues that even without Ha-gler’s testimony about Smith’s statements, there is no possibility that the jury would have believed that Smith, and not Brown, was the actual killer. Because there was sufficient evidence, apart from Hagler’s testimony, to show that Brown, not Smith, murdered the victim, the State argues that any error in the admission of Hagler’s testimony was harmless beyond a reasonable doubt. See
 
 Ex parte T.D.T.,
 
 745 So.2d 899, 906 (Ala.1999) (the erroneous admission of an out-of-court statement “was harmless error because, even without it, the record contains overwhelming evidence of [the defendant’s] guilt”).
 

 Kevin Clayton, a friend of Brown’s, testified as follows:
 

 “Q. [By the prosecutor:] Did you have an opportunity to discuss with Michael Brown where he got that gold Thunderbird?
 

 “A. Yes, sir.
 

 “Q. What did he tell you about it?
 

 “A. He had told me he had got it from a lady. At first he told me it was his.
 

 “Q. First he told you it was his Thunderbird; is that right?
 

 [[Image here]]
 

 “A. Yes, sir.
 

 “Q. Did he later tell you something different?
 

 “A. Yes, sir.
 

 “Q. What did he tell you?
 

 “A. He told me he had killed somebody for it.
 

 [[Image here]]
 

 “Q. Did Michael Brown ever say anything to you about how he killed the person?
 

 “A. Yes, sir.
 

 “Q. Tell us what he told you.
 

 “A. He had cut her.
 

 “Q. He had cut her. Okay. Did he ever go into any more detail about that?
 

 “A. All I remember him saying is that she screamed, and he had cut her.
 

 “Q. Okay. Now did he ever — strike that. Did you at first believe him when he told you that?
 

 “A. No, sir.
 

 “Q. Did he say anything to you to make you think that he was serious?
 

 “A. Yes, sir.
 

 “Q. What did he say?
 

 “A. On the boss.
 

 [[Image here]]
 

 “Q. When we broke, you had said Michael said ‘on the boss.’ Is that like an oath or like saying T swear’ or something like that?
 

 “A. Yes, sir.”
 

 Kelly Watkins, who had once dated Brown,' testified as follows:
 

 “Q. [By the prosecutor:] And when Michael pulled up in this gold Thunderbird, did you ask him about where he got the car or anything like that?
 

 [[Image here]]
 

 “A. I never thought about it because he knew the lady.
 

 “Q. What did you think about the car?
 

 “A. That she had let him borrow it.
 

 “Q. Did you ever have a conversation with him where something else was discussed?
 

 “A. Yes, sir.
 

 
 *940
 
 “Q. Okay. How did that first start, if you remember?
 

 “A. Well, we was riding in a car, and a song came on the radio.
 

 “Q. When you say, We were in the car,’ who was in the car?
 

 “A. Michael Brown, me, and Kevin [Clayton].
 

 [[Image here]]
 

 “Q. Okay. Did he say anything about that song?
 

 “A. He said that the song was referring to what he had done to Betty, or Grandma, as I knew her.
 

 “Q. What did you think when he told you that?
 

 “A. I didn’t think nothing, ‘cause—
 

 “Q. Did you believe it when he said it?
 

 “A. No.
 

 “Q. And so you, Michael Brown, and Kevin Clayton are in the car. Where are y’all going?
 

 “A. We was headed to my friend, Catherine’s house.
 

 [[Image here]]
 

 “Q. Was anything said when y’all pulled up there?
 

 “A. Mike said that he had killed — Mike said that he had got him one and made a lick [killed someone],
 

 “Q. Who did he say that to?
 

 “A. He told that to Alisha [Spindlow] and Catherine.
 

 “Q. Did y’all believe him at that time?
 

 “A. No.
 

 [[Image here]]
 

 “Q. Did you have — during the course of that weekend, did you have more conversations with Michael about what happened?
 

 “A. Yes, sir.
 

 “Q. And did — what was your purpose in—
 

 “A. I was trying to catch him in a lie.
 

 “Q. When you say, ‘catch him in a lie,’ what do you mean by that?
 

 “A. I thought he was lying about what he had done is all. I was just asking him numerous questions.
 

 “Q. Okay. What kind of questions were you asking him?
 

 “A. I asked him where the murder weapon was, and he said he left it at the house. And I said, ‘You were not that stupid. You would have brought the murder weapon with you.’ And he said that he placed a napkin around the handle so y’all couldn’t get his fingerprints.
 

 “Q. And he said he left the napkin—
 

 “A. He left the napkin at the crime scene, too.
 

 “Q. Did he say anything specifically about how he lulled' Ms. Kirkpatrick?
 

 “A. He knocked on the door, and she was letting him in. Whenever she turned around, he tried to choke her, but she wouldn’t die. So, he cut her throat.
 

 “Q. Did he say where he got the knife?
 

 “A. He got the knife in her kitchen.”
 

 After reviewing the evidence presented at trial, we conclude that, even assuming that the challenged evidence was inadmissible on proper objection, there has been no miscarriage of justice that would cause a loss of confidence in the validity of judicial proceedings in this case. See
 
 Ex parte Hodges
 
 and
 
 Young,
 
 supra. Therefore, under all the circumstances, any error in the admission of Hagler’s testimony regarding Smith’s statements would be harmless and would not constitute plain error.
 

 IV.
 
 Conclusion
 

 We conclude that any error in the admission of Hagler’s testimony concerning
 
 *941
 
 Smith’s statements, assuming the validity of Brown’s claim in that respect, could not rise to the level of plain error; therefore, we affirm the judgment of the Court of Criminal Appeals.
 

 AFFIRMED.
 

 SEE, WOODALL, STUART, SMITH, BOLIN,
 
 [1]
 
 PARKER, and MURDOCK, JJ., concur.
 

 COBB, C.J., recuses herself.